## JIN WHITE v. THE STATE.

### *No. 393. Decided March 17.*

**1. Continuance, Sufficiency of Application for.** — In an application for continuance, general statements will not suffice, nor will mere inferences or indefinite allegations. The facts expected to be proved should be stated.

**2. Murder — Indictment, Correction of Defendant's Name in — Practice — Variance.** — Where defendant in an indictment for murder was named " Jin" White, and the copy served upon him recited his name as " Jim" White, but he had been arraigned and pleaded to the indictment without suggesting a variance as to the name, *held*, that a subsequent motion to " have two days service of a true certified copy of the indictment" as returned into court before he was placed upon trial, came too late; and besides, that the variance was immaterial.

**3. Bill of Exceptions as to Exclusion of Evidence, Sufficiency of—Practice on Appeal.**—A bill of exceptions as to the exclusion of evidence which does not state the evidence expected to be elicited from the witness, and the object and purpose of seeking it, is too indefinite to be considered on appeal.

**4. Murder—Malice—Motive.**—On a trial for murder, where the State was permitted to prove that about a week before the homicide the witness said to defendant, " I heard F. (the deceased) hallooing at you;" to which defendant replied, " Yes, I will fix him yet," and it was objected that the evidence was immaterial and irrelevant, *held*, that the evidence was relevant and admissible on the questions of malice and motive.

**5. Defendant as a Witness—Leading Questions—Harmless Error.**—Where certain questions propounded to defendant on his examination as a witness were ruled out by the court because they were leading, *held*, if error, the ruling was harmless, inasmuch as the same matters were fully testified to by defendant in answer to other questions which were not objectionable.

**6. Charge—Circumstantial Evidence—Confessions.**—On a trial for murder, where the State has introduced in evidence defendant's confessions that he committed the crime, the court is not required to charge the law as to circumstantial testimony with reference to the other evidence in the case of that character.

**7. Same — Intoxication. —** On a trial for murder, where the State introduced in evidence defendant's confessions made on two different occasions, and the testimony of defendant concerning the same was to the effect that he was intoxicated when the second confession was made, and that he had no recollection thereof, *held*, that the court did not err in refusing an instruction, in effect, that before the jury could convict they must be satisfied that defendant " was in such mental condition or state of mind at the time of making such confession, if

any, as to realize and understand the import or nature of such statement, if any; and in case of a reasonable doubt thereof arising out of the evidence, you should not consider the same in determining as to his guilt."

**8. Intoxication as Affecting the Admission of a Confession. —** Intoxication of the accused at the time he may have made the confession would be matter for the jury to consider in weighing the testimony, and would tend to affect the weight of the confession, but would not exclude such confession from being put in evidence.

APPEAL from the District Court of Jefferson.    Tried below before Hon. STEPHEN P. WEST.

On a trial under an indictment charging him with the murder of one Bob Ford, appellant was convicted of murder of the first degree, his punishment being assessed at a life term imprisonment in the penitentiary.

Bob Ford, the deceased, Jin White, appellant, and several other parties were employed in the Ice, Light and Refrigerator Ice Company's ice house, in Beaumont, Texas.    On the night of September 29, 1893, sometime between 1 and 2 o'clock p. m., Bob Ford was found by the other employes, badly wounded and in an unconscious condition, from several wounds upon his head which fractured his skull.    He languished from the effects of these wounds for perhaps a week or ten days (the exact time is not stated), and died sometime in October, 1893.

Dr. Price was called to see him the night he was hurt, and continued to treat him until he died.    This witness stated, that there were two wounds upon the front part of his head, about an inch apart, which appeared to have been inflicted with a sharp-edged instrument, such as a hatchet or axe.    An iron bar could have inflicted such wounds if it had a sharp edge.    The skull was crushed in, and pressed upon the brain, and the physicians elevated the skull and removed part of the bone.    In the opinion of this witness, Ford was never rational from the time he received the wounds until he died.    The witness tried to talk to him, but could never get him to say anything but "yes" and "no" in answer to questions.

John Bender, for the State, testified:    That about a week before Ford got hurt, he met the defendant when he was going home from the ice house, about 6 o'clock in the morning, and said to him, "I heard Bob Ford hollooing at you."    To which defendant said, "Yes; I will get away with him yet."    This testimony was objected to by defendant.

William Delaney and his son, Walter, also testified that defendant, White, had made threats to take the life of deceased, some ten days before Ford was wounded.

Defendant was arrested for the crime just after its occurrence, but was released because there was no positive evidence against him.    He subsequently, however, confessed to Delaney that he had committed it, and at the instance of the sheriff, it was arranged that Delaney should get de-

fendant into the ice vault to drink beer, and that Bob Campbell and John Broach should conceal themselves in the vault and overhear any confession he might make to Delaney. This arrangement was carried out, and the parties testified to the confession of defendant to Delaney, that he, defendant, had killed Ford.

William Delaney's testimony is as follows, viz.:  I know defendant, Jin White. I knew Bob Ford. (Witness points out the defendant on trial, in court.) Bob Ford is dead. I don't know what caused his death. He must have died in October, A. D. 1893; don't remember the exact time of his death. Shortly before his death he got hurt down at the ice house. He got cut with an axe or hatchet or something. At the time he got hurt I was working at the ice house. Bob Ford was employed firing for the ice company. The defendant was working at the same furnace with Ford. I saw Ford the night he was hurt. I worked about fifty feet from where the defendant, White, and Ford were at work. The last time I saw Ford was when he came over to where we were at work, and stayed there about five minutes, and he went back to his boiler and went to firing up; this was before he was hurt. I think he got hurt about twenty-five minutes after 1 o'clock. When I first saw Ford, after he was hurt, he was about fifty or sixty feet south of his furnace, on his hands and knees, crawling around trying to get up. He had two large cuts on his forehead. He did not say anything to me. Just before I saw Ford when he was hurt, his helper, Jin White, came to where Westbrook and I were at work. He sat down where we were at. There was a man there where Westbrook and I were working. This man was a stranger to me. He was a white man. He said that he was just from the World's Fair at Chicago. I have never seen this man since. We were talking about the World's Fair. Jin White, the defendant, sat there listening to us talk about five minutes, when he asked Westbrook to roll him a cigarette. Westbrook said, "All right, when I fill up my furnace." Westbrook then filled his furnace and made a cigarette for defendant, Jin White.

When White started back to his furnace, I asked him where Bob Ford was. He (White) said he was asleep. I said to him, " You had better go and wake him up; this is no place to sleep; men are paid here to work, not to sleep, and every tub should stand on its own bottom." White said, " He asked me kindly to fire up for him, and let him get a little sleep. I will go back and fire up for him this time, and will then wake him up. I promised myself that I would never fire up for him any more." I saw White go over to his furnace and open the fire door and fire up. When he stuck his fork down by the furnace door that he was firing with, he called out, " Ford." He called Ford two or three times, then went up on the shaving pile, in the front of his furnace, and called Ford two or three times, when all at once White called to me. He called me two or three times, saying, " Run here! Run here, everybody!" West-

brook and the stranger who was over at our furnace and myself ran over there. When we got there Ford was crawling around on his hands and knees, and he was all bloody. There was a large pile of shavings between where Ford was at when I first saw him after he was hurt and the furnace doors, where White was at work. Any one working at the furnace doors where White was at work could not see any one out where Ford was at when I first saw him after he was hurt. White appeared to be greatly agitated and excited when we got to where Ford was hurt.

After White was turned out of jail on Sunday night, on the following Tuesday night I had a conversation with the defendant, White, about Bob Ford being hurt, which was three or four days after Ford was hurt. White was not in jail or in the custody of an officer at the time. He (White) made voluntary statements to me about the hurting of Bob Ford. I did not make any threats, or use any force or persuasion, or any promise, to induce him to make the statements. He just came up and told me. I never forced or persuaded him to tell me. I advised him to behave himself. He just came up and said, " Well, I sure done the deed." I said, " Yes, you ought to be ashamed, White." About this time Mr. Campbell walked up and we hushed. He said he done the deed by knocking the man in the head with a piece of flat iron. I never had any further conversation with him about it until I was speaking to him in the ice vault about it. He was not in jail at that time, nor in the custody of an officer. I made him no promise nor used any threats or persuasion on him. We talked the whole thing over. Mr. John Broach and Bob Campbell were standing in the ice vault, in about one foot or foot and a half of us. He was not forced to make any statements. We went in and commenced talking about it, and he up and told me the whole thing.

I said, " White, this reminds me of the night Ford was hurt." He said, " Yes, we had lots to drink that night." I said, "Jin, when you told me that you was going to kill Ford I didn't believe you would do it." He said, " Didn't you?" I said, " No, I did not." He said, " Well, when I tell you I am going to do anything, you can depend upon my doing it." I asked him what he hit him with, and he said a piece of iron. Then I asked him what he did with it, and he said, " I threw it overboard." I asked him how many licks he hit, and he said two. He never told me why he did it. He just said he knocked him in the head, down there in a little shaving cart. I don't know what all he didn't say. He said so much, I don't remember it all.  He said that he had hit him in the head with a flat piece of iron, or a piece of iron. I asked him how many licks he hit him, and he said two. Then I said, " You must have hit him very hard," and he said, " I did. When I hit him he just quivered like a hog." I said, " When you hit him, did you come right over to where we were?" And he said yes. He said, " You are the only person that knows about this," and if I ever told it, I would go the

same as Bob Ford did.   Mr. John Broach and Bob Campbell heard all that was said.   This occurred in the nighttime, in the little ice vault in the factory.   After this conversation the defendant and I walked across the ice tanks and went downstairs.

We found Bob Ford about 100 feet from the river.   I never knew of any difficulty between Bob Ford, deceased, and the defendant, Jin White. They would quarrel sometimes like men do who are working together.   I had not heard any quarrel between Bob Ford and Jin White in the last week or two before Bob Ford was hurt.   Before Bob Ford was hurt, White used to come to where I was at work upon the ice tank and tell me that if he ever caught Bob Ford asleep in the little cart, that he was going to knock him, Ford, in the head.   I would say to White, "Old boy, you had better let that alone.   You are going to get into it."   There was no one present when he made these statements, except one time when my son, Walter Delaney, was present, and that was about a week before Bob Ford was hurt.   At that time he said that he was going to knock Ford in the head.   I never asked him why.   I thought that perhaps he was prejudiced against him, and did not ask him.   I was up there pulling ice, and he came to me and said, "If he goes to sleep to-night in that shaving cart, I am going to hit him in the head with that piece of iron. I am going to do him up."   I told him that he had better let him alone, my boy.   He then got up and left, and I kept on at work.   Bob Ford was firing at that time.   I don't know whether Ford and White had had any difficulty at this time, when White told me the above.

Cross-examined:   No, sir, I did not kill Bob Ford.   I am right certain of it.   I was working at the other furnace, and had nothing against the man at all.   Bob Ford and I never had any difficulty while I was working around him.   I was pulling ice and White was passing fuel.   Bob was putting fuel in the furnace.   White told me he was going to knock him, Ford, in the head.   When I was pulling ice I never told Mr. Self that I was going to get away with Bob Ford.   White told me several times that he was going to kill Ford.   I pulled ice three, four, or five months.   Bob Ford worked there all the time I worked there.   It was about fifty feet from the furnace Ford and White worked to where I was working on the night Ford was hurt; could see them while at the furnace, but could not see them when they walked back to throw anything in the furnace.   I have testified in this case before.   I testified that I could see White after he had the cigarette made by Westbrook, and went back to his furnace, up to the time he began to call Ford.   I saw him go upon the shaving pile and heard him call Ford, and then he began to call to me to run there, and he said, "Everybody run here."   Jim Westbrook and the white man, a stranger, were the only ones there with me that night; the other two fellows from the World's Fair had gone away at 12 o'clock.   There were several men down there that night before

Ford was hurt. I don't know who they all were. It was sometime after 1 o'clock when I first saw Ford after he was hurt. It was about 12 o'clock when Ford was last over where Westbrook and I were at work. He may have gone from there up into the engine room. I never watched him. These two strangers that were over to our furnace did not go over to the furnace that Ford and White worked at. Ford was over where we were several times. These strangers left about 12 o'clock. When White came over and had Westbrook to roll the cigarette, he did not seem to be excited. I did not notice anything peculiar or unusual about him or his appearance. When he got his cigarette, he went back to his furnace and fired up at one of the fire doors, and opened the other one, and stuck his fork down by the door and began to call Ford. He then went up on the shaving pile and called Ford; then he began to call, " Run here, everybody." White was terribly excited when we got to where he was; he looked that way.

White told me several times if Ford ever went to sleep in the shaving cart that he, White, intended to do him up. I was told that White was arrested the next morning on suspicion. I don't know of my own knowledge that he was arrested. Mr. Langham came out to my house the next morning after Bob Ford was hurt. I never told Mr. Langham anything about the threats I had heard Jim White make against Bob Ford. Mr. Langham is, and was at that time, sheriff of Jefferson County. He was out to see me about what I knew about Ford getting hurt. I never told Mr. John Self that I knew that White did not strike Bob Ford. I never told him, on Tuesday night, after Bob Ford was hurt, that I knew Jim White did not hit Bob Ford; that I saw Jim White all the time after Bob Ford left the furnace where I was at work until I saw him when he was hurt, and that I knew Jim White did not do it. The first time White told me anything, after Ford was hurt, was on Tuesday night, after he had been arrested. He came up where I was, when I said, " It looks like they must have locked you up." He said, " Yes, but I am out. I usually make my words good, and whenever I say anything I do it." I said, " Yes, damned if it don't look that way." (Delaney was here asked to say everything that White said to him at that time. He answered:) When a man is not interested, he don't pay much attention to it. He, White, may have said more, but I don't remember. He never said anything more to me about it until the night in the ice vault. When we went in there we got to talking about it, and I said, " Well, White, what did you hit him with?" He said, " With a piece of iron." I said, " It looked like it was done with a hatchet, to me;" and he said, " No, it is a piece of iron." I said, " It cut a terrible gash. What did you do with it?" He said, " I threw it overboard." I said, " Did you knock him senseless?" and he said, " Yes." I said, " You must have hit him a hard lick, by his not hallooing." White said, " Yes, I did." I said, " When

you came over to us, was that when you hit him?" and he said "Yes." These are just exactly the words that were said, as well as I remember them.

I then said to him "Mr. Campbell is a nice man," and White said, "Yes." I had known White, at this time, about a year. I worked where he worked for about four months. I was pulling ice most of the time. I had, on two or three nights before Bob Ford got hurt, passed fuel for Westbrook, and was doing so the night Bob Ford got hurt. White and I never worked together before I went to work at the ice plant. The night we, that is White and I, went in the ice vault we had three pints of beer. I know that we had three pints, for White drank one, and I drank one, and I spilt one on the floor. It was as dark as pitch in there. I don't know if White had drank anything or not before we went in the vault; I did not see him have anything to drink. I never saw him drink anything; never saw him drunk. I did not see Bob Campbell or John Broach in the vault, but knew that they were in there when we went in there. It was so dark that you could not see six inches before your eyes; I could not see Jin White, it was so dark.

Redirect: When we went out of the vault, Mr. Broach and Mr. Bob Campbell could see us by raising a cloth over the hole where ice was run in, and see us walk across the tank as we went back to our work when we left the vault. White went across the ice tanks, back to his work. I stopped upon the ice tank.

Recrossed: The first one I ever told what White told me about Ford was Mr. Campbell. I had a chill there one night, and Mr. Campbell told me to go and lay down upon the boiler, but I told him I would not do it; that I was afraid I would get knocked in the head, and he laughed at me. Afterwards we got to talking about it, and I told him what White had told me about killing Bob Ford.

Redirect: After I had told Mr. Campbell, I then told Mr. Langham, the sheriff, if he would have some one to hide out there in the ice vault, I would have White to make the statements again that he made to me, so they could hear them.

Bob Campbell testified: I know Jin White. (Points him out.) I knew Bob Ford; he is dead. He died sometime in October. I saw him, I suppose, about twenty-five minutes after he was hurt, on the morning of the 29th day of September, 1893, between 1 and 2 o'clock. At 1 o'clock I told Ford to oil up for me while I took a nap, and between 1:15 and 1:40 Westbrook came in and told me some one had knocked Ford in the head. I went down; found Ford on his knees and hands. I took hold of him, and says, "Who struck you?" He, Ford, says, "Pap." I said, "Pap who?" and Ford said, "Pap Smith." I helped him up and sat him down on the steps of the ice house, and sent Jin White after the doctor. After I sat him down, I struck a match and examined his wounds, and found

him to be unconscious. When he told me that Pap Smith had struck him I thought he was conscious. A shaving cart was eight or ten feet from where Ford was; there was a load in the cart, and blood on the shavings between Ford and the cart, which was further from the furnace than Ford was. The doctor got there about 3:30 o'clock. I then told White to hitch up the cart and take Ford up to the drug store. White said, "All right," and he carried Ford up there. I told White about 5 o'clock, at 6 o'clock, when he got off, for him to take the mule and cart and go and take Ford home. White said he would not do it; at 6 o'clock he was going home; that he did not like Ford a damned bit, anyway, and that he was not going to do it. Delaney reported to me the manner in which Ford got hurt. Delaney took a chill one night. I told him to go down on the boiler. He said he was afraid. I gave him my coat. He lay down up in the engine room. I asked him what he was afraid of. He said he was afraid he might get knocked in the head like Ford. He then told me what White told him, and I told Mr. Langham afterwards.

I heard a conversation between White, the defendant, and William Delaney, the witness who has just testified, in the ice vault. John Broach, William Delaney, Jin White, and myself were present. White and Delaney came into the ice vault; Broach and I were already in there. When in there Delaney says to White, "This reminds me of the night when Ford got killed." White said, "Yes, we had plenty to drink that night." Delaney said, "White, when you told me you were going to do Ford up, I did not believe it;" and White said, "Well, whatever I tell you I am going to do, I mean it." Delaney said, "White, what did you hit him with?" White says, "I hit him with a square piece of iron. I hit him two good blows, and left him for dead." Delaney said, "What did you do with the piece of iron?" He said, "I throwed it overboard." Delaney then said, that "Bob Campbell is pretty good sort of a fellow." White never said a word. Then White said, "Delaney, you and I are the only ones who know anything about this, and you had better keep your mouth, or I will do you up like I did Ford." Delaney and White then left the ice vault. Broach and myself then raised a cloth that was covering the hole or chute where they run the ice into the vault, and we saw Delaney and White as they went from the vault we were in. White went on down to the furnace, and Delaney stopped up on the ice tank. It was dark in the ice vault where the conversation occurred between Delaney and White.

Cross-examined: We were in the vault for that purpose. The lights had been turned out in the ice vault before Delaney and White came in there. I could not see Delaney and White, for the reason that it was too dark to see your hand before your face six inches off. I could not see John Broach when Delaney and White were in the ice vault. I saw Delaney and White when they went across the ice tank from the vault. On

the night Ford was hurt, in the early part of the night, as I passed by where Ford and the defendant were at work, I heard them quarrelling, and stopped and asked them why they couldn't get along without quarrelling. I then went to the engine room.

John Broach corroborated Campbell as to the confession of the defendant, and circumstances attending it.

Jim Westbrook testified: I knew Bob Ford; he is dead. I know Jim White. I was working at the Ice and Light Company's plant, here in Beaumont, when Bob Ford got hurt. I was engaged as fireman, at the other furnace. There are two furnaces at the ice house. Both of the furnace doors face the south. It is about forty feet from the fire doors on my furnace to the fire doors at which Ford was at work. William Delaney worked at the furnace that I worked; he passed fuel to me. White, the defendant, worked for Ford at his furnace; he passed fuel for Ford at his furnace, the same as Delaney did for me. Bob Ford was hurt sometime about 1 o'clock in the morning. The last time I saw him before he got hurt, was about 12 o'clock that night; he was over to the furnace where I was working. There were two men who said they were just from the World's Fair at Chicago. Ford was talking to them. I did not know these two men; they were strangers. They left the ice house where I was at work about 12 o'clock. I have never seen either of these men since they and Ford left my furnace, about the same time. The next time I saw Ford, he was hurt. After Ford left my furnace I saw White firing over at the furnace where he and Ford worked; from where I was working I could see White all the time he was at work. There is a large car light hanging about halfway between the fire doors of the two furnaces. It is as light as day where we work, when the arc light is burning. We have this arc light, and we have incandescent lights, and when we open our furnace doors we have light from the fire in the furnaces. I saw Jim White all the time after the time when Ford left my furnace until he was discovered after he was hurt. When White would fire up his furnace, he would go out on the north side of the shed, where we had benches to sit down on to cool off when we got hot. Ford when found was on the south side of the shed, and about sixty or sixty-five feet from the furnace. White was firing just before Ford was discovered.

Ford when found after being hurt was about sixty or seventy feet from the furnace doors where Delaney and I were at work; from where Ford was at when found when hurt it was about 120 feet to the river. The blow pipe from the tram mill and the chain belt to run off slabs were between the river and where Ford was hurt. All under the blow pipe is filled in with sawdust. Just before Ford was found hurt, White came over to the furnace where Delaney and I were at work. There was a man there with us. He said he was a brakeman, and that he was going to go to Galveston. We were talking. The man said he was from Ohio. As

I had lived in Ohio, I was talking about that State. White sat down, perhaps four or five minutes, and listened to us talk, when he asked me to make him a cigarette. I said, "All right; wait until I fill up this fire door," which I did, and then I rolled up the cigarette for him; and when he lighted it, and started back over to his furnace, Mr. Delaney asked him where Ford was. White replied, "He asked me to fire for him awhile; that he wanted to take a little sleep." Delaney says, "White, you go wake him up; this is no place for men to go to sleep; they are paid to work and not to sleep." White said, "All right. I will go back and fire up this time, and I will promise you that I will not fire for him any more." White went to his furnace, and took his fork and filled up one of the fire doors, then stuck his fork down by the furnace door and called Ford. He called him two or three times; then he climbed up on a pile of shavings and sawdust that was between where he was at and where Ford was found, and called again two or three times, when I heard him call to Mr. Delaney, and say, "Run here! Run here, everybody!" saying, "Somebody has knocked Ford in the head." Delaney, this stranger at our furnace, and myself ran over to where Ford was. When we got there I found Ford crawling around, with blood all over him. When I examined, I found that he had two large gashes in his head, on the front part of the head. I went up and waked Mr. Bob Campbell, the engineer. When he got there we sent White after a doctor. The doctor got there, I suppose, about half-past 2 o'clock. When the doctor got there, we hitched up the cart and carried Ford over to Mr. Caswell's drug store.

Cross-examined: When White was over at my furnace, and got me to roll a cigarette for him, just before we found Ford hurt, I did not notice anything unusual about his appearance. I did not discover that he was in any way excited or agitated; but when I got over to Ford, where White found him hurt, he was very much excited and agitated, and all broke up. I saw White all the time after he left my furnace when I rolled the cigarette for him, until he called for us to run there, and I know he did not hit him, Ford, between the time I made the cigarette and the time he called us. I saw Bob Ford several times after he got hurt and before he died, and he appeared to be conscious when I saw him. He knew who I was. I asked him if he knew me, and he would say, "Yes, it is Westbrook." I heard him make no statement as to who hit him. In going from where Ford was found to the river, one would have had to go out in front of my furnace, and I could have seen them; I did not see Jin White go to the river, or near it. I saw Bob Ford go up to where the witness Campbell worked, sometime about 12 o'clock on the night when Ford was hurt, and I saw him shortly afterwards come back downstairs from the engine room, and that was the last I saw of Ford before he was hurt.

The defense was, that defendant was too drunk at the time of the confession to know what he was saying or doing. Several State's witnesses testified that they saw him about the time, just before and after his confession, and that he was not drunk. Defendant himself testified that he was drunk, and had no recollection of making the confession. He testified that he did not commit the deed.

*Douglass & Jackson*, for appellant, filed an able and interesting brief.

*R. L. Henry*, Assistant Attorney-General, for the State.

DAVIDSON, JUDGE.—Appellant was indicted for and convicted of the murder of Bob Ford. The killing occurred in the town of Beaumont. The punishment assessed was life imprisonment.

Application for continuance was made for several witnesses, all of whom appeared at the trial except Becky Cole. By her it was expected to be proved, "that one Pap Smith was in the town of Beaumont when Ford was injured." The diligence was wholly insufficient. The fact that Smith may or may not have been in the town of Beaumont on the night of the homicide is wholly immaterial, unless it was expected to connect him, directly or indirectly, with the homicide. The fact that he was in Beaumont, as stated, did not tend to exculpate defendant or inculpate Smith. Again, the statement that he was in the town of Beaumont on the particular night in question is too general and vague. "General statements will not suffice; nor will mere inferences or indefinite allegations. The facts expected to be proved should be stated definitely." Miller v. The State, 31 Texas Cr. Rep., 609. If Smith was in the town of Beaumont, and that fact was known, he was certainly at some particular place. The witness knew something of his movements if she was cognizant of his presence. The application was properly overruled.

Defendant was indicted under the name of Jin White, whereas the copy of the indictment served upon him recited his name as Jim White. When arraigned, and after pleading to the indictment, he requested that he have two days service of a " true certified copy of the indictment" as returned into court, the reason assigned being a variance in the name, as above stated. This came too late after his arraignment and plea; and besides, the variance was immaterial. Johnson v. The State, 4 Texas Cr. App., 268.

A bill of exceptions recites, that defendant " offered to prove by Walter Delaney, the little son of William Delaney, whether he and his father, William Delaney, had ever talked with one another about threats testified to have been made in the ice house by Jin White to William Delaney, in his, Walter Delaney's, presence, about one week before Bob Ford was hurt." Objections interposed by the State were sustained. This bill is too indefinite to be considered. It should have stated the evidence ex-

pected to be elicited from the witness, as well as the object or purpose of seeking it. Davis v. The State, 14 Texas Cr. App., 645; May v. The State, 25 Texas Cr. App., 114; Walker v. The State, 19 Texas Cr. App., 176; Counts v. The State, 19 Texas Cr. App., 450; Willson's Crim. Stats., secs. 2368, 2516.

At about a week before the homicide, the witness Bender said to defendant, "I heard Bob Ford hallooing at you," and defendant replied, "Yes, I will fix him yet." This evidence was objected to because immaterial and irrelevant. The objections were not well taken. The remark or reply of defendant was relevant to the questions of malice and motive.

Objections were sustained to certain questions asked defendant by his counsel while testifying in his own behalf, because the questions were leading. Whether this was or was not error is not necessary for us to consider, because, when put in another form, the questions were answered and the matter of inquiry fully testified to by the witness. There was no error in this matter.

The contention that the court erred in failing to instruct the jury in regard to the law applicable to circumstantial evidence is without merit. The proof of the confessions of defendant relieved the court of the duty of so charging. Willson's Crim. Stats., sec. 2342; Wampler v. The State, 28 Texas Cr. App., 352.

The exceptions reserved to isolated and detached excerpts from the court's charge are without merit, and any discussion of them we deem wholly unnecessary. Upon the trial the State adduced evidence of defendant's confessions, made upon two different occasions. The defendant introduced proof to the effect that he was intoxicated when the second confession was made; and he himself stated, if he made such confession, he had no recollection of it. His memory was rather distinct as to the circumstances surrounding him up to, as well as immediately after, said confessions were shown to have been made. Upon this state of case, the court refused to give in charge to the jury the following instruction, requested by defendant's counsel, to-wit:

"You are instructed, that before you can convict the defendant on his confession (or oral statement), if any was made by him, you must be satisfied from the evidence that he was in such a mental condition or state of mind at the time of making such confession, if any, as to realize and understand the import or nature of such statement, if any; and in case of a reasonable doubt thereof, arising out of the evidence, you should not consider the same in determining as to his guilt."

The court's refusal to give this instruction was not error. Intoxication of the accused at the time he may have made the confession would be a matter for the jury to consider in weighing the testimony, and would tend to affect the weight of such confession, but would not exclude such confession from being put in evidence. Commonwealth v. Horne,

9 Gray, 110. " The degree of intoxication which leaves one capable of making a narration of past events, or of stating his own participation in a crime, is not sufficient to exclude the inculpatory statement from the consideration of the jury." The State v. Greer, 28 Minn., 426; Commonwealth v. Horne, 9 Gray, 110; Rex v. Derrington, 2 Car. & P., 418; Rex v. Thomas, 7 Car. & P., 345; King v. The State, 40 Ala., 314; Gates v. The People, 14 Ill., 433; The People v. Barker, 60 Mich., 277; The State v. Staley, 14 Minn., 105; The State v. Jones, 54 Mo., 478; The State v. Phelps, 74 Mo., 128; The State v. Fredericks, 85 Mo., 145; The State v. Rush, 95 Mo., 199; The State v. Mitchell, 61 N. C., 447; Heldt v. The State, 20 Neb., 492; Commonwealth v. Hanlon, 3 Brewst., 461; 3 Rice on Ev. (Crim.), sec. 315; Whart. Crim. Law, secs. 676, 635.

As presented to us, the record discloses no sufficient reason for reversing the judgment; wherefore it is affirmed.

*Affirmed.*

Judges all present and concurring.