### A. C. SNOWBERGER v. THE STATE.

#### No. 289.   Decided March 23, 1910.

**1.—Murder—Jury and Jury Law—Jury Wheel—Constitutional Law.**

The Act of the Thirtieth Legislature, page 269, known as the Jury Wheel Law, relating to the selecting of juries in counties with cities of certain population, is constitutional, and this question is no longer one open to discussion.

**2.—Same—Continuance—Practice on Appeal.**

Where a conviction of murder is reversed by the Court of Criminal Appeals on other grounds than the motion for continuance, the latter need not be considered.

**3.—Same—Murder in the First Degree—Express Malice.**

Where, upon trial for murder, the State's evidence showed that there was no assault or attempted assault by deceased; that he was unarmed and in his nightclothes and used no abusive language towards the defendant, and that defendant abused deceased and threatened to kill him, the same sustained a conviction of murder in the first degree, although the transaction occurred suddenly.

**4.—Same—Charge of Court—Deadly Weapon—Want of Intent to Kill.**

Where, upon trial for murder, the evidence showed that defendant killed deceased with a knife, the length of the blade of which was about two and one-half inches long, and defendant testified that he did not intend to kill the deceased, but that he struck him with a knife to release the latter's hold on him, the court should have charged article 717, Penal Code, with reference to the instrument used, etc., in committing the homicide. Following Washington v. State, 53 Texas Crim. Rep., 480.

**5.—Same—Charge of Court—Adequate Cause.**

Where, upon trial for murder, there was evidence by the State that no assault was made by the deceased upon defendant, there was no error in the court's charge on adequate cause that an assault or an assault and battery so slight as to show no intention to inflict pain or bloodshed is not deemed adequate cause; and this although defendant's testimony showed that the deceased had struck the defendant with a stick causing both pain and bloodshed.

**6.—Same—Charge of Court—Manslaughter.**

Where, upon trial for murder, the evidence showed on the part of the defense that the deceased struck defendant with a stick causing pain and bloodshed, following a former provocation between the parties in which deceased cursed defendant and threatened him with arrest, and had assaulted one of defendant's companions, a charge of court on manslaughter which limited the adequate cause to the assault of the deceased upon defendant and failed to submit the other matters preceding said assault, was too restrictive. Following Brown v. State, 54 Texas Crim. Rep., 121, and other cases.

**7.—Same—Charge of Court—Manslaughter—Deadly Weapon.**

Where, upon trial for murder, defendant testified that the deceased had struck him with a stick the weight of which had not been shown, there was no error in the court's charge that if said stick was not capable of inflicting death or serious bodily injury, etc., the offense would be manslaughter, and the same did not tend to confuse the issues of manslaughter and self-defense.

**8.—Same—Charge of Court—Self-Defense—Grouping Facts.**

Where, upon trial for murder, the charge of the court on self-defense applied the law to all the salient defensive matter in the case, and upon real and apparent danger from defendant's standpoint, the objection that the same did not affirmatively apply the law to the facts was untenable.

**9.—Same—Charge of Court—Resort to Other Means than Killing—Self-Defense.**

Where, upon trial for murder, the evidence raised no suggestion which would have made it incumbent upon defendant to resort to other means to avoid the killing, but showed that the deceased made an assault upon defendant with a stick under circumstances which, if believed by the defendant from his standpoint, raised the issue of justifiable homicide, it was reversible error in the court's charge to instruct the jury that in case of justifiable homicide in protection of the person, all other means must be resorted to by the accused to prevent the killing. Following Baltrip v. State, 30 Texas Crim. App., 545.

Appeal from the Criminal District Court of Dallas. Tried below before the Hon. Robert B. Seay.

Appeal from a conviction of murder in the first degree; penalty, imprisonment in the penitentiary for life.

The opinion states the case.

*Samuels & Curtis* and *Gammon, Worsham & Pope,* for appellant.— On the question of the insufficiency of the evidence to sustain a conviction of murder in the first degree: McCoy v. State, 25 Texas, 33; Ferrell v. State, 43 Texas, 503; Farrer v. State, 42 Texas, 265; Ake v. State, 30 Texas, 466; Hamby v. State, 36 Texas, 523; Neyland v. State, 13 Texas Crim. App., 536; Ross v. State, 10 Texas Crim. App., 455; Jackson v. State, 33 Texas Crim. Rep., 281.

On question of the court's charge that if an assault and battery be so slight as not to inflict pain or bloodshed it is not deemed adequate cause: White v. State, 13 Texas, 133; Bergstrom v. State, 36

Texas, 336; Pippin v. State, 36 Texas, 696; Webb v. State, 8 Texas Crim. App., 115; Stewart v. State, 15 Texas Crim. App., 598; Forbes v. State, 35 Texas Crim. Rep., 24.

On question of court's charge on manslaughter: Miers v. State, 34 Texas Crim. Rep., 161; Franklin v. State, 34 Texas Crim. Rep., 286; Spivey v. State, 30 Texas Crim. App., 343; Meuly v. State, 26 Texas Crim. App., 274; Lister v. State, 3 Texas Crim. App., 17; Brown v. State, 54 Texas Crim. Rep., 121, 112 S. W. Rep., 80; Kannmacher v. State, 51 Texas Crim. Rep., 118, 101 S. W. Rep., 238; Waters v. State, 54 Texas Crim. Rep., 322, 114 S. W. Rep., 628; Earles v. State, 47 Texas Crim. Rep., 559, 94 S. W. Rep., 464.

On question of court's charge on self-defense: Hackett v. State, 13 Texas Crim. App., 406; Boddy v. State, 14 Texas Crim. App., 528; O'Connell v. State, 18 Texas, 343.

On question of court's charge on justifiable homicide: Hunnicutt v. State, 20 Texas Crim. App., 632; Tillery v. State, 24 Texas Crim. App., 251; Meuly v. State, 26 Texas Crim. App., 274; Baltrip v. State, 30 Texas Crim. App., 545.

*F. J. McCord*, Assistant Attorney-General, for the State.—On question of court's refusal to charge on deadly weapon: Hatton v. State, 31 Texas Crim. Rep., 586; Hill v. State, 11 Texas Crim. App., 456; Martinez v. State, 35 Texas Crim. Rep., 386.

RAMSEY, Judge.—On March 5, 1909, appellant was convicted in the Criminal District Court of Dallas County of murder in the first degree, and his punishment assessed at confinement in the State penitentiary for life. This judgment was the result of an indictment filed in said court against him on January 2 preceding, in which he was charged with the murder of one W. B. Anderson by then and there *cutting* the said Anderson with a knife.

There are a great many questions raised on the appeal, most of which have been briefed very carefully, and the more important of which we will consider. In order to make the opinion understood, it will be necessary to make a somewhat detailed and particular statement of the evidence. It was admitted on the trial that on the night of December 12, 1908, appellant killed said Anderson at the White Star Rooming House in the city of Dallas. That deceased at this time, and for some time prior thereto, was engaged in running a public rooming or lodging house, and that he was 70 years of age at the time of his death. That appellant and his companions went to this house to secure lodging between 12 and 1 o'clock at night, when deceased was called from his room in response to their request; that the rooms controlled by deceased and let by him for lodging were on the second floor, and were reached by a stairway leading from the sidewalk; that the killing took place on the sidewalk near the foot of this stairway, and that the only eyewitnesses to the killing were a Mexican, Eduardo

Cano, and a white man, Harry Jacoby, and appellant. The first witness introduced by the State was one Frank Hutton, who testified that he had known Anderson for some two years, and had a room at his house on the night of the killing; that his room was some ten or fifteen feet from that occupied by deceased, and that there was a bell in Mr. Anderson's room suspended from the ceiling, which was attached by a string to the screen door leading into the rooming house, so that when the door opened deceased was awakened by the ringing of this bell. That shortly after 12 o'clock on the night of the homicide he heard the bell ring and heard Mr. Anderson get up in his sock-feet and go to the desk, which set at the intersection of the hall by which you enter the house; that he heard a conversation in which three or four persons were engaged, and recognized Mr. Anderson's voice; that one of these voices asked for a room, when deceased replied, "I have no room for you," and the voice heard by him said, "Why, you are not full up?" to which Mr. Anderson replied, "I don't make a habit of taking drunk men; I wouldn't clean up after you for the money," and to this the voice replied, in a louder tone, "If you say I am drunk, you are a God-damn liar." That Anderson replied to this: "Go on now, or I'll call the police." That he then heard a shuffling of feet down the long hall as if they were going out, but there was no exit out that way, and Mr. Anderson said: "You can't get out that way, come this way." That he then heard their steps turn and go on down towards the entrance into the building. That after they had gone farther away he heard a friendlier voice nearby say: "You know me, I am all right," to which Mr. Anderson replied: "Yes, you are a gentleman when you are sober." That he then heard a voice call from downstairs, "Let the old son-of-a-bitch come on down and call his police, I'll fix him." That the voice downstairs repeated this several times, and he then heard Mr. Anderson say: "I will go down and call the police." That the next thing he heard, in just a few seconds, was Mr. Anderson crying out: "Frank! Frank! Murder! Murder! Police!" That without waiting to dress, he went hurriedly down in his night clothes, and when he reached the foot of the stairway Anderson was standing with his hands touching either wall of the stairway; that he took hold of him and set him down on the stairsteps, when he said: "Run for a doctor." That he started for a nearby drugstore, but seeing it was closed, went to one over on Main Street to telephone for a doctor, and was gone about ten minutes; that when he came down the stairway and reached Anderson he found that his throat was cut almost from ear to ear and blood spurting everywhere. That he saw no stick; that Mr. Anderson had two walking sticks, and always used one in walking; that after the killing he saw both of these upstairs in the room where he always kept them. W. N. Noles, introduced by the State, testified that he was deputy sheriff, and was what is known as night man of the sheriff's force; that he heard someone cry out, "Murder! Police;" that he ran outside

of the courthouse and soon located the trouble at the White Star Rooming House; that when he reached the scene of the difficulty deceased was sitting on the sidewalk up against the building at the foot of the stairway with his throat cut; that he looked for weapons of all descriptions, and saw no stick; that if there had been one there he would have seen it, because he looked for such things particularly; that he remained there a few minutes, and went on down the street, and stopped in front of a pool-hall; that while standing at this place talking to officer Fanning, appellant came up and called Mr. Fanning aside, who, after a few words, arrested him; that he walked up to where they were standing and made an examination and search of appellant; that they found his right hand bloody; also saw blood on his face, shirt and coat, which appeared to have been spattered on there; that they found in appellant's pocket a knife, the blade of which was covered with fresh blood; that he saw no bruise or wound on appellant's hand or head, but made no examination for wounds or bruises; that appellant did not say anything about any wounds or bruises on him, and he saw no signs of any; that he had his hat on when arrested, and he did not remove it or see it removed.

Charles Fanning, a police officer, was also introduced, who testified to substantially the same facts, except that he arrived at the scene of the killing after Noles had got there; that he saw no stick or other weapon lying by or near deceased, and believed if there had been such stick he would have seen it. That while standing down near the pool-hall talking to Noles, appellant came up and placed his hand on his shoulder, and called him aside; that they walked away two or three steps and appellant then said: "There is going to be hell at the White Star Rooming House tonight, for old man Anderson has been raising hell with me," to which he replied: "There has already been hell, you have killed that old man." He also testifies to the blood on appellant's coat, face and hand, and to searching him and finding a knife, which he says was about two and one half inches long, and covered with blood; that appellant made no claim that he had been assaulted by deceased; did not show them nor did they see any wounds on his face or bruise on his hand; that appellant had on his hat all the time, and that they made no examination for wounds or bruises.

Jim Deming, a witness called by the State, testified he was warden at the city jail on the night in question; that it was well lighted with electric lights, and that he saw no wound or bruise of any kind on defendant; that he did not examine his head, and that there could have been a wound on his head and he not have seen it; that the jail has iron cells with many sharp edges on which one could easily produce a wound or abrasion; that he saw no one butting his head on these corners or edges, nor did he find any blood or hair on the iron bars after appellant was removed. Dave Reedy, the jailer at the county jail, testified to the same effect, and further that no one had ever

called his attention to any bruises on appellant, not appellant himself nor Mr. Curtis, his counsel. This was the testimony for the State.

Appellant, after testifying to his residence and occupation for some little time, then stated that at the time of the homicide he was hauling gravel for Mr. Houston, and stayed at his house about two miles out of town; that on the night in question he came to town to see someone who owed him a small sum and to pay a small account that he owed; that he went to several saloons and had five or six glasses of beer during the evening; that he was not drunk, but had enough to feel it; that about midnight he decided to go to bed, and so remarked to those with him; that he usually went out to his room on the Oak Lawn car, but that this car stopped at 12 o'clock, and had gone; that Harry Jacoby was with him, and had been in the saloon drinking with him; that when he said that he was going to bed, a Mexican, whom he had never seen before that evening, said that he was going to bed, too, and wanted to know of him where he could get a room; that he told the Mexican he was going down to the White Star Rooming House, and that he might get a room there; that the Mexican, Jacoby and himself all went together; that when they ascended to the second floor they met deceased in his night clothes, and that he, appellant, asked him for a room; that deceased said: "I have no room for you; you are drunk," to which he replied: "Old man, you are mistaken; I am not drunk," to which Anderson replied: "You are an infernal liar," to which he answered: "Well, if I am a liar, maybe you are one, too." That deceased then stepped back; that he thought he was going back to his room, and that he and the Mexican went downstairs; that soon after this Mr. Anderson returned, and that he heard him fussing with Jacoby, who remained just outside of the door at the head of the stairway; that at this juncture he, appellant, said: "Let the old man come down and call the police." That by this time he and the Mexican had got two-thirds of the way down the stairway, and that they went on down to the sidewalk; that when they reached the bottom the Mexican turned to the right and he turned to the left, and just as he turned around the corner, and while he was on the sidewalk and had his back turned, someone struck him a tremendous lick; that if it had not struck downward, and had been more to the side, it would have knocked him down; that little before the lick he felt someone clutch him in the coat collar; that he turned immediately around and saw the old man with something raised to strike him again; that he could not tell what it was, but thought it was something that he had gone back for; that he had seen iron pipes around there, and thought maybe it was one he had; that when he saw his hand uplifted with something in it he thought he was going to strike him a second time, and when he brought both of his hands up together in front to ward off the lick, he opened his knife; that at this time deceased struck him on the hand, and he, appellant, jerked loose from him, and as he did so he

made one lick towards deceased with his knife; that when he did this deceased turned him loose, and he walked away; that he did not intend to kill deceased, and did not know that he had killed him until after he was arrested; that he struck to get loose, and as soon as he did get loose he walked away. He testifies he did step up to Mr. Fanning and call him aside, but what he said to him was, "Don't let any more of those fellows come on to me, I have had trouble enough already." He admits he told no one about the assault deceased had made on him, nor did he show the officers or anyone else at the jail the wound that the lick made on his head and the bruise on his hand, but he did show the wound and bruise to Houston and one Joe Britton at the county jail on Monday following his arrest on Saturday night; that the lick on the head cut a gash about an inch long and bled, and that his hair was bloody from this wound when he showed it to Houston and Britton, and that the place on his hand was still swollen; that he had stayed several times at the White Star Rooming House, and he and deceased had never had any misunderstanding, and that he had no ill will towards him. He also testified he was a teamster, and that the knife he had was one he used in mending harness. Harry Jacoby, introduced by defendant, to a large extent corroborated his testimony. He testified that after the parties reached the rooming house upstairs, that appellant asked deceased for a room, to which he replied: "I have no room for you; you are drunk," and then makes the same statement almost literally as to the language used by deceased that appellant makes; that just then deceased stepped back in the direction from which he came, and that appellant and the Mexican went downstairs; that when they had gone about two-thirds of the way down Mr. Anderson came back with a stick in his hand; that this was a stick three or four feet long, and that he struck at him with it around the screen door, but just barely touched him; that he thereupon said to Mr. Anderson, "Old man, what are you hitting me for? Don't you know me? I am your friend," to which Anderson replied: "Great God, Harry, is it you? I beg your pardon a thousand times." At this juncture appellant called back from downstairs, "Let the old son-of-a-gun," or "son-of-a-bitch"—he does not remember which—"come down, I'll fix him," or "attend to him"—he does not remember which. That he tried to keep Anderson from going down, but that he did go down with the stick in his hand; that he followed on after him, and that when he reached the foot of the stairs deceased was standing out on the sidewalk with the stick up, holding it aloft, and that he saw appellant make a rake with something, but could not see what he had in his hand; that thereupon deceased stepped back, and that appellant and the Mexican walked off together, and that he saw no more. Bob Henson, also introduced by the defendant, testified he reached the scene of the difficulty a short time after the killing occurred and before Fanning and Noles came up; that he saw a round stick three or four feet long, which looked like a broom handle, lying

on the edge of the sidewalk opposite where the old man was lying four or five feet from him; that he did not examine this stick, nor did he see anyone move it; that he went on down the street and met appellant, who told him that Anderson had tried to do him up; that he had hit him on the head with a large stick. Houston and Britton, introduced by the defendant, testified that on Monday following the killing on Saturday night, that they went to the county jail and talked to defendant, and while there he showed them a gash on top of his head on the left side about an inch long, and that the hair was matted with dry blood; that they also noticed a skinned place on his hand, which was swollen at the time, and both the gash on his head and bruise on his hand appeared to be fresh. This was all the testimony, except the State introduced both Noles and Fanning, who again stated that they did not see a stick lying at the edge of the sidewalk five feet from the body of Mr. Anderson, and that if it had been there they are sure they would have seen it.

1. Appellant, by an assignment of error timely made, again presents the validity of the jury wheel law, asserting that this law is unconstitutional, and in support of his contention makes a strong argument, citing many authorities. This question has been so repeatedly ruled adversely to appellant that the question is no longer one open to discussion. The validity of this act has been affirmed not only by this court, but by the Court of Civil Appeals for the Fifth Judicial District, in which a writ of error, after the most thorough presentation of the question was refused by our Supreme Court.

2. A strong showing is made of error in the action of the court in overruling appellant's application for continuance, and his application to postpone. As these matters can not arise on another trial, it becomes unnecessary to discuss them, though if this were the only matter presented, we should not be inclined to reverse the case on this account.

3. With great earnestness and with a fine analysis of the testimony, appellant strongly urges that the judgment convicting appellant of murder in the first degree is not supported by the evidence. While there is some basis and force for this contention, we are not prepared to agree to it. It has been said that as to the length of time that must elapse between the formed design to kill and its execution, the law can not fix any safe criterion or invariable rule by which it can be determined. It has declared that it must be deliberate and a formed design, but it does not require this design to have existed for any certain or definite space of time. This is a question which must be determined in each case by its own circumstances. Jordan v. State, 10 Texas Crim. App., 479. While express malice must be proved and can not be inferred, still, like other facts, it may be proved by circumstantial evidence. Its actual existence is manifested by external acts and these external acts or circumstances may transpire before, at the time, or immediately after the killing. King v. State, 34 Texas Crim.

Rep., 228; Thomas v. State, 33 Texas Crim. Rep., 607; Gallaher v. State, 28 Texas Crim. App., 247. It is also said that this formed design and a cool and sedate mind may be shown by proof of cool, calm and circumspect deportment and bearing of the party when the act is done immediately preceding or subsequent thereto. From the absence of any obvious or known cause to disturb the mind, or arouse the passions, the nature and character of the act done, the instrument used, as well as the manner in which the murder is committed, declarations not only indicating his state of mind, but also the purpose and intent with which he acts, and the motive by which he is actuated and all such matters and things pertinent to the issue which may be suggested by the facts of the killing. Miller v. State, 31 Texas Crim. Rep., 609; White v. State, 32 Texas Crim. Rep., 625. It has also been held that statements made by the slayer before, at the time of, and even after the homicide, are often pertinent evidence to show express malice. When tested by these rules, if we assume that the jury wholly disbelieved appellant's statement and that of his witnesses, and found that there was no assault or attempted assault by deceased; that he was unarmed and in his night clothes; that he had used no abusive language to appellant or his associates, and if they further believed, as they were justified in doing, that appellant abused deceased, and threatened to kill him, considered in connection with the manner of his death, and his statement to Officer Fanning after the homicide, the jury might well conclude that the killing was on express malice, and, therefore, murder in the first degree.

4. Complaint is made that there was error in the charge of the court in that the charge should have instructed the jury that they were to consider the means or instrument used in committing the homicide in determining the intent with which it was done, and that if they found the instrument used one not likely to produce death, that it was not to be presumed that death was designed unless from the manner of its use such intention evidently appeared. Article 717 of our Penal Code is as follows: "The instrument or means by which a homicide is committed are to be taken into consideration in judging the intent of the party offending; if the instrument be one not likely to produce death, it is not to be presumed that death was designed, unless from the manner in which it was used such intention evidently appears." It has been said that presumptions of law which are against defendant should not ordinarily be given in charge to the jury. Shaw v. State, 34 Texas Crim. Rep., 435. The converse, we think, of this proposition is equally well settled that wherever at all applicable, that presumptions of law favorable to a defendant should be given in charge to the jury. What is a deadly weapon has not always been easy to determine. The testimony in this case shows that the length of the blade of the knife in question was about two and one half inches. Judged by its results it was undoubtedly a deadly weapon, and in the absence of testimony by appellant to the effect, in substance, that he

did not intend to kill deceased, we should not hesitate to hold that the charge was not subject to just complaint. We think, however, in view of the fact that there was no further description of the weapon, and in view of the further fact of appellant's testimony that he did not intend to kill deceased, that he struck at him to induce him to release his hold on him, and that it was night, that the court should have given in charge to the jury the substance of article 717 of the Penal Code quoted. The result of a blow does not always determine one's intent. Death is sometimes accomplished by the use of a weapon not necessarily deadly in its character. Washington v. State, 53 Texas Crim. Rep., 480, 110 S. W. Rep., 751.

5. Again, complaint is made of the following portion of the court's charge: "The following are deemed adequate causes: An assault and battery producing pain or bloodshed. But an assault or assault and battery so slight as to show no intention to inflict pain or bloodshed is not deemed adequate cause." The last paragraph of this portion of the court's charge is made the subject of serious complaint in that, as is claimed, there is no evidence on which to predicate such a charge; that appellant's testimony distinctly raises the issue that deceased had assaulted him and struck him with a stick, causing both pain and bloodshed. There is, however, as we believe in the case, testimony from which the jury might have concluded that no such assault had been made upon appellant. It is significant that the officer who arrested him, and the jailer who took him in charge, saw no wounds or bruises upon him, and that appellant at the time did not call their attention to these wounds. It is in evidence both by Noles and Fanning that there was no stick near the place where the killing occurred, and the evidence of Hutton is to the effect, in substance, that deceased carried neither of the sticks he was accustomed to carrying downstairs with him. The location of the parties and the narrowness of the hall, and the fact that deceased went down immediately behind them, might have raised in the minds of the jury the belief that if not a battery, there was at least an assault by deceased intended and designed to make them leave the place, and yet of such slight moment as not to have been of such gravity or importance as to raise the issue of manslaughter. It must be confessed that this view, if correct, is a deduction from the statement of facts, but we believe it is a fair deduction, and that the trial court, evidently with this in mind, did not err in giving the charge complained of.

6. Again, it is urged that the charge of the court on the subject of manslaughter is erroneous and hurtful in that, taken as a whole, it is vague, indefinite, ambiguous and conflicting, and couples in one submission manslaughter and murder in the second degree, and was thereby calculated to confuse the jury and injure appellant. After giving the formal definitions of manslaughter, and defining adequate cause, the court thus instructs the jury: "Now, if you believe from the evidence beyond a reasonable doubt that the defendant with a

deadly weapon under the immediate influence of a sudden passion aroused by adequate cause, as the same has been hereinbefore explained, and not in defense of himself against an unlawful attack reasonably producing a rational fear or expectation of death or serious bodily injury, with intent to kill, did, in the county of Dallas, and State of Texas, on the 12th day of December, 1908, as alleged in the indictment, cut with a knife and thereby kill said W. B. Anderson, as charged in the indictment, you will find the defendant guilty of manslaughter and assess his punishment at confinement in the penitentiary for not less than two nor more than five years.

"If you believe from the evidence that the deceased, W. B. Anderson, first assaulted the defendant and unlawfully inflicted upon the defendant pain or bloodshed by striking him with a stick, and that the defendant not in his necessary self-defense to protect himself from death or serious bodily injury, real or apprehended, but moved by sudden passion, if any, aroused by pain or bloodshed, if any, inflicted upon him by the deceased, W. B. Anderson, in unlawfully striking him with a stick, if he did, cut and killed said W. B. Anderson, as charged in the indictment, then his offense would be no greater than manslaughter. Or if you believe from the evidence that the deceased, W. B. Anderson, unlawfully assaulted the defendant with a stick not capable of inflicting death or serious bodily injury and that the acts and conduct of said deceased Anderson at the time, if any, would commonly produce such degree of anger, rage, sudden resentment or terror in a person of ordinary temper, under like circumstances, with the defendant, as to render the mind incapable of cool reflection, and that the defendant was moved by such cause to such degree of anger, rage, sudden resentment or terror as to render and did render him incapable of cool reflection, and that while under the influence of such sudden passion, if he was, the defendant did unlawfully cut with a knife and killed the deceased Anderson and not in his necessary self-defense, then his offense would be manslaughter.

"If the defendant killed the deceased, W. B. Anderson, as charged in the indictment, but at the time of the killing was not actuated by express malice, but was under the influence of a rash, sudden and hasty impulse, or under the influence of sudden anger, rage, resentment or terror, then unless such state of mind was produced by some adequate cause as hereinbefore defined, the offense was murder of the second degree, unless the killing was done under circumstances, which under the law justified or excused it, but if such adequate cause did exist and produced such sudden anger, rage, resentment or terror, such as rendered the mind of the defendant incapable of cool reflection, then the offense was manslaughter, if not excused or justified by law."

The proposition submitted by appellant under this assignment of error is to the effect that the court in his charge should have presented to the jury the law applicable to the case in a plain, definite, positive, unambiguous and direct manner, and comprehensive enough to present

every phase of the case raised by the evidence. In connection with this complaint of the charge of the court, and as a part of same, counsel for appellant also submitted the following proposition: that the court should group all the facts calculated to influence appellant at the time of the killing, and should charge the jury that if they believed such facts, taken separately or together, produced in appellant's mind such a degree of anger, rage, sudden resentment or terror as to render it incapable of cool reflection, and that appellant was moved by such cause to such a degree of anger, rage, sudden resentment or terror as to render and did render him incapable of cool reflection, and that while acting under such sudden passion the appellant did cut and kill deceased Anderson, then and in that event he would be guilty of no higher offense than that of manslaughter. This proposition is based on the 13th assignment of error, wherein complaint is made of the charge of the court which limits the law of manslaughter to one phase of the case under the evidence, that is, to the striking of appellant by deceased with a stick, and because same wholly fails to submit to the jury the issue of manslaughter under the evidence testified to by appellant and Jacoby to the effect, in substance, that deceased, who was the keeper of a public rooming house, had refused without cause to let him have a room, had accused him of being drunk, had ordered him from the premises, had cursed him, called him a liar, had threatened him with arrest, and had assaulted one of his companions, and after he had left the premises had come downstairs and violently assaulted him with a stick. We think it must be held that the charge of the court was too general, and that it should have submitted the issue of manslaughter with reference to all the facts in evidence, and particularly with reference to the testimony outlined in the above assignment. We think this contention is squarely supported by the decision of this court in the case of Brown v. State, 54 Texas Crim. Rep., 121, where Judge Davidson, speaking for the court, says: "The charges given are very general, following the statutory definition. Among other things, the court charged that 'a provocation must arise at the time of the commission of the offense, and must not be the result of a former provocation, and that it is not enough that the mind be merely agitated by the passion arising from some other provocation, or a provocation given by some other person than the party killed, and, further, an assault and battery producing pain or bloodshed, or any condition or circumstance, or combination of conditions or circumstances, which is capable of creating and does create sudden passion, such as anger, etc., which renders the mind incapable of cool reflection,' and, further, in a general way, instructs the jury that the provocation causing sudden passion must arise at the time of the killing, and it is the duty of the jury in determining the adequacy of the provocation, to consider in connection therewith all the facts and circumstances in evidence, and if they should find that by reason thereof the defendant's mind at the time of the killing was incapable of cool

reflection, and that said facts and circumstances were sufficient to produce such state of mind in a person of ordinary temper then the proof as to the sufficiency of the provocation satisfies the requirements of the law. Exception was reserved to these phases of the charge and omissions. Appellant's contention is that these charges on manslaughter are not sufficient; that as given the charge relegates the adequate cause and sudden passion, first, to an assault producing pain or bloodshed, and, second, a general statement as above indicated. His further contention is that the court should have gone farther and applied the law to the facts, more particularly to the end that the jury might understand the nature of adequate cause and sudden passion arising out of the immediate facts attending the homicide and as applicable thereto. If the deceased provoked the difficulty by taking a seat upon the arm of the chair occupied by appellant and placing his arm around him under circumstances detailed by him, then deceased was the aggressor and produced the occasion of the difficulty, and appellant had the right to ask him to desist, and upon his failure to do so to resent such insult and assault, and if Johnson then attacked him, and caught him in the collar with his hand and struck him over the eye, and followed this up by throwing him on the floor and choking him, these would be additional causes of provocation, and although appellant may have gone too far in using his pistol by shooting it would still be manslaughter, and this phase of the law should have been given under the facts of this case, and if appellant used more force than was necessary under the law of self-defense, and his mind was incapable of cool reflection, his offense might still be no higher than manslaughter." Miers v. State, 34 Texas Crim. Rep., 161; Franklin v. State, 34 Texas Crim. Rep., 286.

7. Complaint is further made of the last paragraph of the court's charge on manslaughter, copied above, where reference is made to an assault with a stick not capable of inflicting death or serious bodily injury, for the reason that such an issue was not raised at all in the evidence, in that all the testimony as to any assault by deceased with a stick was that same was an assault with a large stick; that this assault did produce both pain and bloodshed, and because this language of the court was calculated to and tended to deprive appellant of his right of self-defense or minimize same in that it directed the attention of the jury to that portion of the evidence which justified the killing of deceased by defendant, and in effect instructed the jury that killing in self-defense would be manslaughter. We do not think there was error in this charge, or that it tended to confuse the issues of manslaughter and self-defense, nor that the effect of it was to minimize the issue of self-defense, or that it operated to deprive appellant of the benefit of the instructions on this issue, or that it had the effect to so confuse the matter as to lessen the effect of the charge of the court on the issue of self-defense. If there was an assault by Anderson with a stick its weight was not shown and such assault might well be suffi-

cient to raise the issue of manslaughter and yet not be deemed sufficient to justify appellant in killing Anderson.

8. Again, complaint is made of the charge of the court on the issue of self-defense. This complaint raises the question and urges that the court did not affirmatively apply the facts of the case to the law of self-defense. It is not claimed there was any affirmative error in the charge of the court either in respect to the rights of appellant or the definitions of self-defense, as these matters are submitted by the court. The charge of the court is indeed very general, and does not at all attempt to group the facts constituting self-defense or instruct the jury with reference thereto in any detail. This is sometimes difficult to do, and we are not prepared to hold where there was a clear submission of the law of self-defense, and a fair and liberal instruction with reference to this right, that the mere failure of the court to group particular facts was erroneous. Here the court charged self-defense with reference both to real and apparent danger, and instructed the jury that if deceased had made an attack on appellant which caused him to have a reasonable expectation or fear of death or serious bodily injury, and that acting under such reasonable expectation or fear of death he killed deceased, then they should acquit him. The court also instructed the jury that if deceased was armed at the time, and was making such attack on defendant, and if the weapon used by him and the manner of its use was such as was reasonably calculated to produce death or serious bodily harm, then the law presumed deceased intended to murder or aimed to inflict serious bodily injury upon him. The court also instructed the jury that it was not necessary to the right of self-defense that the danger should in fact exist if it reasonably appeared from the circumstances of the case that danger existed, that the person threatened with such apparent danger had the right to defend against it to the same extent that he would were the danger real, and that in determining whether there was reason to believe that such danger existed, that the facts must be viewed from the standpoint of appellant and from no other standpoint. It is not conceived, in view of the square issue here made, that any further elaboration or effort to apply the facts to particular details would have aided appellant or have better presented his cause to the jury.

9. Finally, it is urged that the court erred in the following paragraph of his charge: "Homicide is justifiable in the protection of the person against any other unlawful and violent attack besides one with intent to murder, or to inflict serious bodily injury, and in such case all other means must be resorted to for the prevention of the injury, and the killing must take place while the person killed is in the very act of making such unlawful and violent attack." This charge is objected to because it assumes that if deceased assaulted appellant, that such assault was not with intent to murder or inflict upon him serious bodily injury, and because it imposes upon appellant in this case the resorting to all other means of repelling the assault before killing

deceased, such burden not being imposed upon him by the laws of this State, and for the further reason that there was no evidence in the case raising such issue. The proposition submitted under this assignment is that under our law appellant had the right to defend himself against any assault or threatened assault made upon his person by deceased calculated to inflict death or serious bodily injury, and it was not essential to his perfect right of self-defense that the danger be real or in fact exist, and that acting under such reasonable appearance of danger he was neither bound to retreat nor resort to other means of averting danger, but had the right to kill deceased if the danger was immediate and threatening. We think, as applied to the facts of this case, that the clause, "and in such case all other means must be resorted to for the prevention of the injury," was not only not required to be given, but that it was not proper that it should have been included in the court's charge. Here was a square issue made by the evidence of an assault by deceased upon appellant with a stick under circumstances which, if believed, raised the issue of justifiable homicide. There is no suggestion of any fact in the evidence which would have made it incumbent upon him to resort to other means, nor do we well see how, if his testimony is to be believed, he could have resorted to other means to avoid the killing, or what other means he could have resorted to. Quite a similar charge was considered by this court in the case of Baltrip v. State, 30 Texas Crim. App., 545. There the court gave the following charge: "That the killing would not be justifiable by self-defense if the apprehended danger of serious bodily harm or death could have been prevented by the use of less violence than taking the life of deceased." Speaking of this charge, Judge Hurt says: "Under repeated decisions of this court, this charge is erroneous. When the accused acts under such apprehended danger, he is not bound to retreat nor resort to other means of averting such danger, but may slay his adversary if the danger be imminent and pressing, or if it reasonably appears to be to the accused." The charge here given has not infrequently been given by courts in this State, and may sometimes be entirely proper and appropriate to be given, but we think as applied to the facts of this case, it was certainly not necessary, and probably should be held, of itself, reversible error.

Many other matters raised on the appeal and discussed in the brief, we have deemed it unnecessary to mention. Most of them will not occur upon another trial, and do not require treatment at our hands.

For the errors pointed out the judgment is reversed and the cause is remanded.

*Reversed and remanded.*

McCord, Judge, not sitting.