By the Court,
Beatty, J.:
The defendant in this case appeals from a conviction of murder of the second degree. The principal point made in support of the appeal is that the district court erred in its charge to the jury. But there is nothing in the record to show what the charge of the court was. All that is stated in the bill of exceptions is that “the court then, after argument by counsel, gave to the jury the instructions herein of record, marked plaintiff’s instructions, numbers 1, 2 and 3, and instructions of its own motion.” In The State v. Huff (11 Nev. 22), we commented upon and condemned the practice of referring to loose papers on file in the case instead of incorporating them in the bill of exceptions; but in that case, in the absence of any objection on the part of the state, and because of the fact that all the original papers had been destroyed by fire, we consented to treat the document in question as a part of the record.
Here, however, the objection is taken and urged that the paper copied into this transcript as the charge of the district court, given of its own motion, is not a part of the record, and cannot be considered.
The objection, in our opinion, is well taken. We can look at nothing outside of the record (C. L. 2105), and the charge given by the court of its own motion in a criminal *375 case is not of itself a part of the record, and can only be made so by being included in a bill of exceptions. (C. L. 2051, 2075; State v. Forsha, 8 Nev. 139.) A bald statement, that the court charged the jury of its own motion, does not make the charge so given a part of the bill of exceptions, but merely puts upon record the fact that the court did give an instruction which was not asked. If that fact is all that the party desires to have appear, then his bill of exceptions is sufficient; but if his object is to avail himself of some supposed error in the charge, the charge itself must be put upon record.
Now, it is perfectly apparent that the legislature never intended that the record in a criminal case should consist of a bundle of loose papers. The papers that are to constitute the record or judgment roll are specified in the statute (C. L. 2075), and it is made the duty of the clerk to fasten them together and file them within five days after entry of a judgment of conviction. The bill of exceptions is one of the papers to be so fastened to the rest of the judgment roll before it is filed; but it is no part of the clerk’s duty, aud he has no right to read the bill of exceptions and attach to it, or copy into it, the papers and documents which he may consider are referred to. All he has to do with the bill of exceptions is to attach it to the rest of the record before that is filed. He can neither add to nor subtract from it, but must leave it as it was left by the judge who signed it. If, then, it refers to other papers that are no part of the record, those papers are not bound up in the judgment roll. They remain as they were before, loose, disconnected, unauthenticated, liable to loss, alteration or substitution. It may be that in practice these evils would never be experienced, but the legislative will has been clearly expressed that the record of a conviction in a criminal case shall be made up, authenticated and preserved in a particular mode. There is nothing unreasonable in the statutory requirements, and they ought to be adhered to. If they are adhered to there will be no room for question as to what is and what is not of record; but if they are disregarded, questions may arise as to the genuineness of documents referred *376 to in the bill of exceptions, and when such questions can be avoided they clearly ought to be.
The instructions which the court gave at the request of the prosecution are, however, a part of the record (0. L. 2011, 2012, 2051, 2075), and it is claimed that the following were erroneous:
“ No. 1. The jury are instructed that the true difference between simple murder (or murder of the second degree) and murder of the first degree, under our statute, does not consist in the length of time the assailant must have deliberated, but whether he had, at or before striking the fatal blow or firing the fatal shot, formed the design to slay the deceased. If such design was formed, however recently, it will be murder of the first degree.
“No. 2. The jury are instructed that the premeditation or intent to kill need not be for a day, an hour or even a minute, for if the jury believe from the evidence there was a Resign, a determination, to kill distinctly formed in the mind at any moment before or at the time the pistol was fired, it was a willful, deliberate and premeditated killing, and therefore murder of the first degree.”
In order to a clearer comprehension of the points made in reference to these instructions a brief recital of the substance of the testimony will be necessary.
According to the testimony for the state the defendant shot and killed another Chinaman while he was under arrest in the hands of an officer, and just as he was being carried into jail. The defendant, testifying in his own behalf, admitted the killing, but stated that a very short time previous thereto he had witnessed an altercation between the deceased and his (defendant’s) brother, which ended in the shooting and wounding of his brother by the deceased; that he had asked the deceased why he shot his brother; that the deceased replied that it was none of his business, and that if he did not look out he would kill him, too; that he (defendant) thereupon stepped into his house, thirty feet distant, and armed himself with a pistol; that he came out, saw the deceased pursued and captured by the officers, intercepted him at the door of the jail and shot him. It was *377 a clear case of a voluntary and unlawful killing on the defendant’s own statement of the circumstances, and the only question was as to the degree of his guilt, whether murder of the first degree, murder of the second degree, or manslaughter. It seems to have been conceded in the district court, on all sides, that the provocation (seeing his brother shot by deceased) was sufficient in law to mitigate the crime of defendant to manslaughter, provided he acted under the impulse of passion and before the expiiation of reasonable cooling time, and the instructions asked by the defendant and given by the court cover these points. The following is one of the instructions so asked and given:
“The jury are instructed that the killing of a human being upon sudden heat of passion, caused by a provocation sufficiently strong to make the passion irresistible, the killing is manslaughter, and not murder, provided that sufficient cooling time did not intervene between the provocation and the killing for the voice of reason to be heard. Tbe law assigns no limit within which cooling time may be said to take place. Every case must depend on its own circumstances, and if you find from the evidence in.this case that the defendant, upon sudden heat of passion, caused by provocation sufficiently strong to make the passion irresistible, and that sufficient cooling time did not intervene, you will find the defendant guilty of manslaughter.”
It is evident that a clerical mistake has occurred in the copying of this instruction, but it shows clearly enough that the jury was instructed in language of his own choosing, and in terms quite as favorable as the law warrants, that the defendant was only guilty of manslaughter, if he acted under the impulse of passion, caused by a sufficient provocation, and before the intervention of reasonable cooling time. He can certainly have no fault to find as to the manner in which the law of voluntary manslaughter was laid down. And,if the jury attended to this instruction, and understood its ¿neaning, we must conclude that in convicting him of mu/rder in the second degree, they decided, as a matter of fact, either that he had never been impelled by passion, or tliat it had had time to subside before the shooting. The *378 testimony in tlie case would have well warranted either finding. From the defendant’s own account of the transaction, he appears to have proceeded with the utmost coolness and deliberation throughout, and there was other testimony strongly tending to negative the existence of uncontrollable passion at the time of the shooting.
This made it proper for the prosecution to ask the court for instructions, based upon the hypothesis that, at the time of the shootiúg, the defendant’s mind was free from passion and under the dominion of reason; and it is upon that hypothesis that the two instructions first above quoted are evidently based. They are not to be read by themselves, but in connection with each other and the rest of the charge. So read, we do not think they can have prejudiced the defendant.
Taking the second one alone, out of its context, it will, perhaps, bear the construction which defendant puts upon it; and whether a lawyer would or would not understand from it that a bare intent to kill makes the killing murder, it is certainly not improbable that a jury might understand it in that sense. Of course, if a jury were so instructed in a case like this, it would be error. It requires something more than a bare intent to kill to make a killing murder in any degree. In all cases of voluntary manslaughter, such as defendant contended this was, there is an intent to kill. But it is supposed in such cases that the slayer is incapable of exercising his reasoning faculties on account of the predominance of passion, and it is therefore said that there is no deliberation and no malice aforethought. In order that the intent to kill may ^constitute express malice, it must be formed in a mind free from irresistible passion and capable of reason. If, instead ,of this, the intent to kill is the result of a mere blind impialse of passion, the killing cannot be murder in the first degree, and will not even be murder in the second degree unless the passion was caused by an insufficient provocation or a Reasonable cooling time had elapsed before the killing. Therefore, we say again, that if the jury in this case had befen instructed that a bare intent to kill on the part of the die *379 fendant made liis crime murder, the instruction would have been erroneous, and tbe judgment ought to be reversed. But we do not tbink tbe instructions complained of, read in connection witb tbe rest of tbe charge, could have been so understood. They undertake to state tbe distinction between murder of tbe first and murder of tbe second degree. In another instruction, tbe jury are told that if there was sufficient provocation, irresistible passion, and no sufficient cooling time, tbe defendant is only guilty of manslaughter. But suppose there was no passion sufficient to overpower tbe reason, or suppose a reasonable cooling time bad elapsed before tbe killing? This hypothesis is not expressed in tbe instructions, but is implied, and on such hypothesis they do not misstate tbe law, at least not in a manner that could possibly have prejudiced tbe defendant. Tbe expressions which occur throughout tbe instructions, such as “ premeditation,” “deliberation,” “design, determination, distinctly formed in the mind,” all imply tbe absence of overpowering passion, so that tbe instructions really mean this: If tbe defendant, instead of being impelled by passion was impelled by deliberate revenge — if be was under tbe control, instead of being beyond the control, of bis reason —it matters not bow instantaneously be may have acted upon tbe design to kill, be was guilty of murder in tbe first degree.
If this was tbe meaning of tbe instructions, and read in connection witb tbe instruction in regard to manslaughter, we tbink they must have been so understood; then they stated tbe law applicable to this case correctly. If a killing is unlawful, and if there was a design to kill distinctly formed in tbe mind of tbe slayer — if tbe intent to kill existed in a mind controlled by reason and not impelled by passion — an instant before striking tbe fatal blow, tbe killing is murder of tbe first degree. Tbe time a man deliberates is wholly immaterial. Tbe question is: has be deliberated at all? and whether be has or not depends solely upon whether bis mind, at tbe moment of such intentional killing, is or not under the dominion of reason. If be is capable of deliberation bis intent to kill must be *380 deliberate, and there is express malice. This doctrine is elementary. The text-books are full of it, and all the authorities sustain it.
"We wish to say, however, in conclusion, that we do not approve these instructions as models to be followed hereafter. The most that can be said in their favor is that in this case they did not prejudice the defendant. The first appears to have been drawn from the opinion of the chief justice in Millain’s case. The language of that opinion was proper enough in the connection in which it was used, but it is neither a full nor a perfectly clear statement of the distinction between the two degrees of murder, and there are many cases in which it would be confusing, if not absolutely erroneous. The second is still more objectionable. Its meaning is not clear, but ambiguous and indefinite. It is susceptible of a construction according to which it would be erroneous, and, but for the clear and definite instruction on the subject of voluntary manslaughter by which it was accompanied and qualified in this case, must have been so construed.
The judgment of the district court is affirmed.