## STATE v. HALL

No. 2966

August 4, 1932.                    13 P.(2d) 624.

*Frame & Raffetto* and *Louis Cohn,* for Appellant:

*Gray Mashburn,* Attorney-General; *W. T. Mathews,*
Deputy Attorney-General; *Harley A. Harmon,* District

Attorney; and *Roger Foley,* Deputy District Attorney, for the State:

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

# OPINION

By the Court, DUCKER, J.:

The appellant, John Hall, was convicted in the district court of Clark County of the crime of murder of the first degree. The jury exercised their discretion and fixed the punishment at death. The appeal is taken from the judgment and order denying appellant's motion for a new trial.

■ The conviction of appellant resulted from his killing one John C. O'Brien by shooting him with a pistol on the night of June 15, 1931, near what was known as the Fox ranch situated about six miles south of the city of Las Vegas, Nevada. O'Brien, Hall, their wives, and the former's stepdaughter, Lillian, had been living together at the Fox ranch in a two-room house for a few days prior to the time of the homicide.

The shooting occurred about 10:30 at night, when they were going to their home from Las Vegas in an automobile. Mrs. O'Brien, as a witness for the state, gave substantially the following version of the affair: "Mr. O'Brien was sitting at the wheel, I was sitting in the middle and my daughter on the side. Mr. and Mrs. Hall were sitting in the back seat. When we got near our home where we generally stopped the car Mr. Hall hollered, 'Drive on and don't stop.' Mr. O'Brien drove a short distance, stopped the car, looked back and hollered, 'What's the idea?' Then Mr. Hall commenced shooting. My daughter and I got out of the right side of the car and Mr. O'Brien followed us the same way. Mr. Hall shot twice while in the car and then got out the left side

of the car and shot four times more. I ran around to stop Mr. Hall from hurting my husband further and Mr. Hall hit me. He hit me on the top of the head. He just kept on hitting me then on the head. I kept falling down and getting up. He was cursing all the time. These words I can remember, 'G—— d—— you, I'll get you too.' I ran around the car and asked Mrs. Hall if she would help me. She started beating me up. At the time Mrs. Hall hit me, Mr. Hall was after Lillian. He hit me with a gun. He hit me a good many times and knocked me down. I asked Lillian to run for help. He said there is no need of going for help. He was right behind us. We ran down through the bushes."

Lillian, Mrs. O'Brien's daughter, was also a witness for the state. She testified that she was 15 years of age. She gave the following account of the affair: "On the evening of June 15, 1931, about 10:30 in the evening, my daddie, mother, myself and Mr. and Mrs. Hall were on our way home in a Studebaker car. Mr. O'Brien was driving, my mother was in the middle of the front seat and I was sitting on the outside of the front seat. Mr. Hall told my father not to stop the car. He started to stop and Mr. Hall took out the gun and started to shoot. After the shooting he beat my mother. I started after my mother, and she said to go after father. I started to go down the road after him and he said he was all right. I then went after mother. Mr. Hall was beating her. I heard six shots, two in the car and four outside. I saw no gun or anything else in the hands of Mr. O'Brien."

N. R. Burghart was driving his car on the highway past the Fox ranch between 10:30 and 11:00 on the night of the shooting. He saw O'Brien in the road in front of him with both hands up. His shirt was bloody, and he was staggering. Burkhart took O'Brien to the Las Vegas Hospital, where he died shortly afterwards on that night. An examination of the body by a physician and surgeon revealed bullet wounds, one of which, a wound through the chest, was the cause of death. The bullet causing the latter wound entered the back about

two inches from the spine and emerged in front near the nipple.

Hall and his wife were taken into custody at Yermo, Calif., on the morning of July 16, 1931, by Lester Sample, an inspector with the highway border patrol. Hall was asked by Sample why he killed those folks at Las Vegas, and replied: "I didn't kill anybody." Sample told him that he did, and Hall said: "Why, there was a little shooting went on out there, some shooting. I didn't know I hit any of them." Sample asked him where his guns were, and Hall said he had no guns. Sample found two guns in Hall's suitcase. They were pistols.

A short time afterwards Hall told Sample that O'Brien stole six or seven hundred dollars of his money. He said: "I knew that he got this money and I rented this ranch to watch him and if I caught him spending any of this money I was gong to kill him. If he is dead I sure am glad of it. I was going to shoot him before at their home but my wife interfered and wouldn't let me. If I die in the electric chair he won't be able to spend any of my money."

When Hall and his wife were taken into custody by Sample, they had come into Yermo on a motor express truck. The driver of the truck, T. V. Shafer, testified that they were walking along the road about 1:30 a. m. June 16, 1931, when he took them into the truck. He corroborated Sample in the main as to the statements made by Hall, and in addition testified that Hall said: "He would hate for his friends back in South Carolina to know that he had fired six shots at a man and only hit him three times." He also testified that Hall said that he was glad he did it because O'Brien deserved everything he got. Hall and his wife were detained at Yermo until the arrival of Joe Keate, sheriff of Clark County, on the same day. Hall waived extradition, and he and his wife returned to Las Vegas in the car with the sheriff and his deputy, Mr. Bodell.

The deputy drove the car. Mrs. Hall sat in the front seat with him, while Hall sat in the back seat with the sheriff. Hall was not handcuffed. The sheriff testified

that during the ride Hall said: "The son of a gun stole my money. I killed him and I'm glad of it. I never was happy until I knew he was dead." The witness testified further as to Hall's statements: "He said at one time there about two weeks prior to that time he would have killed him if his wife hadn't stopped him. He said that another time, that what he wanted, or as soon as he found out they had been spending this money that he had lost, he had decided he needed killing and he was going to kill him, and various things of that kind, but it all pertained to that one thing." The witness also testified that Hall said that at the time he shot him, O'Brien was reaching back to strike him; that Hall said, " 'I don't know what he had in his hand, but he had what I thought might be a blackjack in his hand'; that he said he ran out of shells for the big gun and wanted to use the little gun to shoot the others with, especially Mrs. O'Brien; that she had as much to do with the stealing of that money as did O'Brien, and also he figured the little girl would be along with them; that if the little gun had worked he would have killed the others."

Bodell also testified as to Hall's statements on the return to Las Vegas. His version of these statements is substantially as follows: "Hall said, 'Well, I guess you boys thought I was trying to get away from you, but I wouldn't; I was just full of booze, out of my head and just wanted to go somewhere—anywhere.' Later on he said: 'You know that son of a gun stole $700 from me. I told him, I warned him before that that if I ever caught he or any of his family spending any of my money, that I was going to kill him.' "

He told the sheriff that he (Hall) was a good shot; that he would not want any of the boys back in Carolina to know he emptied a gun at a man at that range and only hit him a couple of times; that when he was in the Philippines he used to ride horseback around a center pole with a ball on the post and shoot the ball off with a six-shooter at full speed ahead. He continued and said his only regret was that he did not fix all three of them up, and that, had the small gun worked, he would have

done so, but that the "dog-gone thing wouldn't work"; that he could not pull the hammer back, so he went back to the house to get more shells for the big gun to finish them up, but that he could not find the shells in the house. He said: "If I got to hang, sheriff, I have only one favor to ask of you, that is, that I can throw the dog-gone little gun as hard and as far as I can throw it." The witness gave the following testimony concerning Hall's statements as to the shooting: "O'Brien and his wife were in the front seat of the car. Hall and his wife and Lillian were in the rear seat. They were driving down the road and Hall said to O'Brien, 'don't you stop.' O'Brien was slowing the car down and 'knowing that he stole my money, I knew he had stolen it, and I told him that when I caught him or any of his family spending my money I was going to kill him, and I was so mad and knew at the time they were spending my money, so I pulled a gun and said, "Jack, I told you if I caught you spending my money I would kill you," ' and started shooting."

Hall claimed that the shooting was done in self-defense. He was a witness in his own behalf, and testified at length as to the shooting and his relations with O'Brien shortly prior thereto. Much of Hall's narrative as to his dealings with O'Brien, and conversations between them, which are immaterial, will be omitted from the following summarization of his testimony. O'Brien, his wife and stepdaughter, Lillian, and Hall and his wife had been living at the tourist camp for a short time, and moved to the Fox ranch near which the shooting occurred on the 9th of June, 1931. They lived there in the same house until the night of the homicide. Hall said that O'Brien was a bootlegger. Shortly before their coming to the Fox ranch, O'Brien told Hall he had a deal with a "fellow" to purchase liquor for $2 a gallon and requested him to furnish the money to buy the liquor and go with him to meet this person. He told Hall he would give him 50 cents on every dollar he advanced. Hall assented. They went on this mission in an automobile. O'Brien was driving. Hall had on his person $680 which

he carried in an old tobacco can. O'Brien did not find the person from whom he was to buy the liquor, and they returned home about 11:30 at night. When Hall awoke the next morning he missed his tobacco can. It was the first thing he felt for every morning. He told his wife that O'Brien had robbed him last night of every cent he had. He remembered that when they were out on the trip the night before O'Brien kept feeling back behind him, and that at one time he heard a gun which was in the seat between them hit the can in his pocket. Immediately after he missed his money he called O'Brien into the house and charged him with having stolen it. He told O'Brien to give it up or he would kill him right there. O'Brien told Hall that it did look suspicious, but for Hall not to think that he stole the money. Hall stated: "I said, 'Jack, I'm going to tell you one thing now. I don't want to kill you but if I catch you or any of your family with my money and I can't get it back any other way, I will kill you or get it back.' O'Brien said: 'John, don't say that, it hurts my feelings.'"

On the 13th of June he noticed that Lillian had $3.75, and on the evening of that day at the Fox ranch he overheard O'Brien say to his wife, "You had better quit spending this money around here, John is going to catch on. You had better quit spending it."

O'Brien had a place in Las Vegas where he sold liquor, and Hall took him to this place in his car on the morning of the 15th of June, 1931. That evening O'Brien told him to bring down one of his (Hall's) guns because there were some "stool pigeons" around and he did not want them coming into his "joint" without a search warrant. Hall brought the gun in a paper bag. O'Brien took it into his place and later placed it in the pocket under the steering wheel of the car. Hall had also brought the women into town that day, and in the evening they went to a picture show with O'Brien. Hall remained in the car with a blanket thrown over him. Before they went into the show he heard O'Brien say to Mrs. Hall: "Don't get mad about what I say. You know I love you. You know I do and always will." After the show they

left town in the car for the Fox ranch. O'Brien, his wife, and Lillian were in the front seat. O'Brien was driving. As to the circumstances of the shooting, Hall gave the following version: "I should say we was within fifteen or twenty yards of the house. I said, 'Jack,' I says, 'Your folks have been spending my money around here pretty free and I have heard some other things. I want to talk with you about them.' He started to stop the car. I said, 'Jack, drive this car on.' At the same time, when he started to stop the car he struck at me across the seat with this paper bag. I wasn't thinking about the gun in the paper bag, but when he struck at me I hit the gun with my gun and knocked it up. It was in the paper bag. I said, 'Jack, drive this car on, don't go on stopping here with this crowd here.' I said, 'Drive on.' At that time he throwed the gun into my face, at that time with the paper bag tore off the barrel. Then he hit me in the forehead with my gun and knocked me back in the seat. He said, 'Damn you I will fix you.' He started to get up. When he did that I shot at him twice or three times. At that time his wife and daughter had all started to fight my wife across the back seat. Jack O'Brien's wife and Lillian were fighting my wife across the seat in the back seat. So when I shot Jack said, 'Open this door.' I think he was leaning across the seat and couldn't open it. So then Jack reached over and opened it himself and knocked both women out of the door. That was after I fired the shot. Well, he came out of the car. I got out on the left. He came on around to my side of the car. As he got around the car he raised his arm. I didn't know whether he was going to throw something or what he meant to do. When he did that I finished emptying my pistol at him. When I shot the last shot Mrs. O'Brien came around and said, 'John Hall, you s—— of a b—— you are shooting my husband,' and struck me with something across the shoulder, and at that time I took my empty gun and hit her—that was the 38. The 32 gun I found in the front seat of the car with the paper bag tore about half off of it. We put it in my

suit case after we started off with the car that night."

Hall testified that he was afraid O'Brien was going to kill him from his actions at the time of the shooting and from what he had heard, and that when he shot O'Brien he believed his life was in imminent danger. His testimony as to what he had heard is substantially as follows: On the day before the shooting, one Strickland told him that he had been talking to O'Brien about Hall's money, and had said to him: "Jack you had better give the money back to him. I understand you are accused of taking it. You had better give it back"—to which O'Brien replied: "Before I would give him back a dime of it I would kill the s—— of a b——," and ran back to his car and got the holster and showed he had a gun in it to do it with. Hall's wife told him as they were going home in the car on the night of the shooting that O'Brien and another man had planned to kill him. She said the other man, a stranger, came to the house that night and O'Brien took the man around the corner of the house and through the window she heard O'Brien say to the other man, "You get in your car and go back home and get your gun and meet me where the old Los Angeles highway turns off, I will get John Hall in my car and take him down there and we will make him leave the state or we will kill him." Hall said that the reason he told O'Brien to drive on that night and not stop at the Fox ranch was because he saw a light in the house. There was no light when he left. He thought maybe O'Brien had the other man there to kill him. After the shooting Hall drank some liquor in the house, and then he and his wife left in the car and drove until a tire became flat. Then they left the car and started walking. They continued walking until the truck came along. Hall denied that he stated to the officer that he felt happy because O'Brien was dead. He denied that he pursued Mrs. O'Brien at the time of the shooting. On cross-examination he said he struck Mrs. O'Brien on the head twice with the larger gun; that this gun was on the back seat when he told O'Brien to drive on.

Mrs. Hall was a witness for the defendant. She testified substantially as follows: About ten days before the shooting, when she was alone at the house, O'Brien tried to assault her. She told her husband of it on the night of the 15th of June when they were driving home in the car. On this occasion she also told Hall of a man and woman coming to the house, and that she heard O'Brien tell this man he would ask Hall to go to town and he wanted them to meet him where the road turns off the Los Angeles highway, and that they would take Hall and kill him or make him leave Las Vegas that night; that pursuant to this plan O'Brien asked Hall to go to town but she interfered and prevented Hall from going; that this other man came out of the house after they had gone to bed and tried to get Hall to go to town with them, but Hall refused to go. On one occasion Hall woke her up and she heard Mr. and Mrs. O'Brien talking. She heard O'Brien tell Mrs. O'Brien "if she didn't quit spending that money John was going to catch on to it." Concerning the shooting, she said: "We all started to drive out home and we turned off the New Los Angeles highway on to the old, and Mr. O'Brien made some remark about going back after some milk and Mr. Hall spoke up and told him no, there was some at the house. I told him there was enough to do until the next day, and Mr. O'Brien didn't come back to town. He said he would take us out to the house and then he might come back. We got pretty near to the house and Mr. Hall said to Mr. O'Brien, 'Jack, I see you folks spending my money,' and from then on Jack started to stop the car and throwed something in his face and Mr. Hall knocked the lick off and said, 'Drive this car on Jack, I want to talk these matters over with you,' Jack struck at him and throwed back at him again. With that he struck him on the side of the head. Mrs. O'Brien and Lillian started to beat me and said I was the cause of it; that I had told all that. Then Mr. Hall shot twice or three times in the car, I don't know which. Mr. O'Brien got out on the right side of the car and Mr. Hall on the left.

I did not see Mr. Hall beat Mrs. O'Brien or chase her."

On cross-examination she corroborated Hall as to O'Brien's trying to shoot Hall with the gun that was in the paper bag. She said: "Mr. O'Brien throwed it on to Mr. Hall like he was going to shoot; Mr. Hall knocked it off. He threw it on him again. He knocked it up with his hand. Mr. Hall knocked the gun up with his right hand and shot Mr. O'Brien with his left. Mr. O'Brien was turned clear around in the seat. He was turned plumb sideways in the seat. I think the gun was in his right hand. The gun was clear over the seat. Mr. Hall struck Mr. O'Brien's gun with his gun the first time. The second blow Mr. Hall took his hand and knocked Mr. O'Brien's lick off and shot him. Hall never shot until Mr. O'Brien throwed the gun on him the second time and he knocked his hand up with his hand and shot. Mr. O'Brien cursed Mrs. O'Brien and told them to open the door and they didn't open the door. Mr. O'Brien reached over and opened the door and knocked them both out and went over the top. It was while Mr. O'Brien was trying to get Mrs. O'Brien and Lillian out of the car when the second shot was fired." On redirect examination she stated that after the shooting they found the little gun on the seat of the car.

Seth Custer was a witness for the defense. He knew Hall and O'Brien. He had a conversation with O'Brien in which O'Brien told him that he had a man from the east who had plenty of money. He said, "I am going to work him out of a bunch of money." A few days after Hall lost his money, witness met O'Brien and said: "Jack this man has treated you awful nice. He bought you grub and furniture and paid your rent and you ought to give him his money back." On cross-examination the witness said he was living on a ranch. He had some chickens and had done some bootlegging.

Jack Brighthopt was a witness for the defense. He was a sheet metal worker. He knew Hall and O'Brien. They were in his shop on one occasion and were joking each other. Mr. O'Brien looked at Hall and said: "I don't see how this old buzzard can have a good looking

woman like that and. I am going to steal her." Hall grinned and said: "Jack is about as good a friend as I have in this end of the country." When asked if it was a joshing remark, the witness said: "I figured it that way."

In rebuttal Bodell testified that when Hall was talking of the shooting on the return to Las Vegas he said he had the large gun in his left hind pocket and the little ·gun in his right hind pocket.

Mrs. O'Brien in rebuttal testified that on the night of the 14th of June she had no conversation with O'Brien relating to Hall's money; that O'Brien did not tell her to quit spending money around here or John will "catch on."

The foregoing summarization of the evidence includes all that has any.bearing upon the case made by the state and appellant's defense. Appellant's contention that this evidence tends reasonably to establish that the killing occurred in a chance melee, upon a sudden impulse, and that the elements of first degree murder are lacking, was resolved against him by the jury. Sufficient legal evidence appears in the record to support the verdict and judgment. Inquiry by this court, therefore, as to this phase of the case may not be pursued further.

▆▆▆ Appellant insists that no proper foundation was laid for the admission of the testimony of the witnesses Sample, Shafer, and Keate, as to the statements made by him to them concerning the shooting. In this connection it is urged that the maudlin condition of the defendant, the aftermath of excessive drinking, rendered said statements involuntary. The evidence of appellant's drinking on which this claim is made is as follows: Appellant testified that after the shooting he was nervous and went into the house and took three drinks out of a jug. There were two pints already in the car. His wife said: "John, don't drink any more. You are going to get out. You are going to get drunk." He said: "We had the two pints of whisky in the car." His wife said he was drunk. He stated that the whisky he drank in the house did not seem to have any effect on him. He

testified that he did not remember telling the witness Sample that he would have killed all of the O'Briens that night, including Lillian, and that he did not remember having made such a statement to the witness Keate or Bodell. Asked by his counsel as to his condition when the officers saw him, he said: "I was pretty talkative from the whisky, under the influence of it, talking I guess from all reports." It is to be noted, however, that, when asked if he made the statement he felt happy that O'Brien was dead, he answered, "No sir," and made the following explanation: "I started to feel better—I felt better after they read the telegram to me, to know I was in the hands of officers than I did when I was riding along and wasn't arrested, because I wanted to come back and get the thing cleared up. I didn't want to go on." He stated that was what he meant by saying he was happy. To officer Bodell he said he was not trying to get away: "I was just full of booze, out of my head and just wanted to go somewhere—anywhere."

Witness Bodell testified that, at the time appellant made the statements to which the witness and the sheriff testified, the appellant did not appear to be drunk. On this point Bodell gave the following testimony:

"Q. Did he appear to be drunk or otherwise when you saw him? A. Very sober when I first saw him.

"Q. He did not appear to be drunk? A. No.

"Q. Did he appear to be calm, Mr. Bodell? A. Very calm and collected and joking about the incident."

On this point Sheriff Keate testified as follows:

"Q. Mr. Keate, I will ask you if you noticed the demeanor and actions of the defendant at that time— whether he was cool and calm and collected? A. Mr. Hall was very cool and calm. I judge the full effects of the liquor had not worn off at that time. He still had the effect of liquor.

"Q. Was he cool and calm? A. Yes, sir.

"Q. You would take it he thoroughly understood his position? A. Yes, sir.

"Q. And knew what he was telling you? A. Yes, sir."

While the testimony we have set out indicates that

the appellant had been drinking to some extent prior to making the statements attributed to him by the officers and Sample and Shafer, still it includes testimony upon which the jury could well conclude that his mind was not in a maudlin condition and that he knew what he was saying. The fact that a person charged with crime is intoxicated when he makes a confession will not necessarily exclude it as evidence. It is only when an accused is so drunk when he makes a confession as to render him unconscious of what is saying that the law deems his confession incompetent. Intoxication of a lesser degree is for the jury to consider in determining the weight to give the confession. Eskridge v. State, 25 Ala. 30; White v. State, 32 Tex. Cr. R. 625, 25 S. W. 784; People v. Kent, 41 Misc. 191, 83 N. Y. S. 948; People v. Ramirez, 56 Cal. 533, 38 Am. Rep. 73; 18 L. R. A. (N. S.) 789, note; 16 C. J. 628, 729; 1 R. C. L. 563.

All of the witnesses testifying to appellant's statements said that no inducements or rewards were offered to appellant, or threats made to induce him to confess the killing. The statements were properly admitted for the consideration of the jury.

■ It is insisted also that the court erred in failing to instruct the jury as to the circumstances to be considered in determining what weight should be given to the confessions. We do not think so. No objection was taken to the admission of the statements of appellant on the ground of intoxication. Nor was it otherwise pointed out or suggested to the court that statements of appellant were considered objectionable on that score. The trial court instructed the jury generally in regard to the way in which they should consider and weigh the evidence in the case, and if appellant wished a specific instruction as to the manner of weighing the confession he should have requested such an instruction. This he did not do, and cannot now be heard to complain of the lack of such instruction.

■■ Error is assigned to the admission of the testimony of Mrs. O'Brien and her daughter, Lillian, as to appellant striking and beating the former with a gun

immediately after the shooting. It is insisted that such testimony tended to prove another offense and was therefore objectionable. We think that proof of the offense was admissible as a part of the res gestæ. While not precisely concurrent in point of time, it sprang out of the shooting and followed immediately upon it. It tended to elucidate the frame of mind appellant was in at the time, and was a part or a continuation of the same transaction. Moreover, this testimony tended to prove motive and malice and to rebut the claim of self-defense. It was material and competent for such purposes. The principle upon which the striking of Mrs. O'Brien by the appellant was admissible is well stated in People v. Walters, 98 Cal. 138, 32 P. 864, 865. The court said: "The superior court did not err in admitting this evidence. It is true that in trying a person charged with one offense it is ordinarily inadmissible to offer proof of another and distinct offense, but this is only because the proof of a distinct offense has ordinarily no tendency to establish the offense charged; but whenever the case is such that proof of one crime tends to prove any fact material in the trial of another, such proof is admissible, and the fact that it may tend to prejudice the defendant in the minds of the jurors is no ground for its exclusion. These remarks are applicable to any case in which two persons are murdered or assaulted at the same time, and as part of the same transaction, and the present case affords an excellent illustration of the necessity of the exception to the general rule. On the occasion of this homicide, Mrs. Wall and her son were the representatives of one side of a long-standing controversy, which had resulted in a bitter family feud, and the shooting of the mother immediately after the shooting of the son, by a representative of the other side, was convincing evidence of the motive of the act. It showed the malice which is an essential ingredient of the crime charged and tended strongly to disprove the claim of self-defense, which the people could anticipate if they chose to do so."

Discussing the rule and its exceptions in the case of State v. Adams, 20 Kan. 311, the court, in the opinion

of Judge Brewer said: "The rule of law applicable to questions of this kind is well settled. It is clear that the commission of one offense cannot be proven on the trial of a party for another, merely for the purpose of inducing the jury to believe that he is guilty of the latter because he committed the former. You cannot prejudice a defendant before a jury by proof of general bad character, or particular acts of crime other than the one for which he is being tried. And on the other hand, it is equally clear, that whatever testimony tends directly to show the defendant guilty of the crime charged, is competent, although it also tends to show him guilty of another and distinct offense. State v. Folwell, 14 Kan. 105. A party cannot, by multiplying his crimes, diminish the volume of competent testimony against him. A man may commit half a dozen distinct crimes, and the same facts, or some of them, may tend directly to prove his guilt of all; and on the trial for any one of such crimes it is no objection to the competency of such facts, as testimony, that they also tend to prove his guilt of the others."

See 16 C. J. p. 588, and the many authorities cited in note 8 supporting the principle stated in the text.

■ The case of the State v. McFarlin, 41 Nev. 486, 172 P. 371, relied on by appellant, is not opposed to our ruling in this case. The categorical statement of various exceptions to the general rule made therein was not designed to be exhaustive of all instances in which an exception may be recognized. While the exceptions generally fall into the category stated in State v. McFarlin, supra, and restated in State v. Monahan, 50 Nev. 27, 249 P. 566, it may be broadly stated that evidence of another crime is admissible if it tends directly to prove defendant's guilt of the crime charged. Moore v. U. S., 150 U. S. 57, 14 S. Ct. 26, 37 L. Ed. 996; Farris v. People, 129 Ill. 521, 21 N. E. 821, 4 L. R. A. 582, 16 Am. St. Rep. 283; People v. Moeller, 260 Ill. 375, 103 N. E. 216; People v. Argentos, 156 Cal. 720, 106 P. 65; Renfroe v. State, 84 Ark. 16, 104 S. W. 542; Wallace v. State, 41 Fla. 547, 26 So. 713; Regina v. John Briggs, 2 Moody & Robinson, 199.

The trial court did not err in admitting the testimony of Mrs. O'Brien and her daughter, Lillian, objected to as proving a distinct offense from the crime charged.

Error is assigned to the giving of instruction No. 11, which reads: "It is not essential that the willful intent, premeditation or deliberation, shall exist in the mind of the slayer for any considerable length of time before the actual perpetration of the crime. It is sufficient if there was a fixed design or determination to maliciously kill distinctly framed in the mind of such slayer before the striking of the fatal blow or the infliction of any other cause of death."

It is contended that the instruction is an incorrect statement of the law of first degree murder, and misleading, in that the jury may have been led to believe by the words "fixed design or determination to maliciously kill" that such intent need not be the result of premeditation or deliberation and that a conviction of that degree could be had on facts amounting only to murder of the second degree, or manslaughter. We do not think the instruction read in its entirety and in connection with the rest of the charge could have been so understood. The court instructed the jury in the language of the statute (Comp. Laws 1929, sec. 10069) that manslaughter is a willful killing of a human being without malice, etc. So if the jury attended to this instruction and others which the court gave defining manslaughter, which we must presume they did, the word "maliciously" alone in the instruction complained of would have precluded the idea that a conviction of first degree murder would be proper on facts showing the killing was done in a sudden heat of passion, an essential element in voluntary manslaughter.

It is not at all likely that the jury could have understood the instruction to mean that the fixed design or determination to kill need not be the result of premeditation or deliberation to constitute murder of the first degree. The preceding instruction set out in the language of the statute (Comp. Laws 1929, sec. 10068)

murder of the first degree as "All murder which shall be perpetrated by means of poison, or lying in wait, torture, or any other kind of willful, deliberate, and premeditated killing, or which shall be committed in the perpetration, or attempt to perpetrate any arson, rape, robbery or burglary. * * * " The element of premeditation or deliberation is repeated in the forepart of the instruction complained of, and throughout the charge as a whole it is made clear that the intention to kill must be the result of premeditation or deliberation to constitute murder of the first degree. The purpose of the instruction was to inform the jury that length of time for deliberation is not an essential ingredient in murder of the first degree. In this respect it tends to refute the contention that the jury could have understood it to justify a conviction of murder of the first degree, if only murder of the second degree was proven.

The instruction is inaccurate in that it omits to inform the jury that such deliberation could have been formed at the very moment the fatal shot was fired. State v. Acosta, 49 Nev. 184, 242 P. 316; State v. Ah Mook, 12 Nev. 369; State v. Millain, 3 Nev. 409. This, however, is an error in appellant's favor, of which he cannot complain.

The next instruction objected to is instruction No. 15. The instruction contains an extended definition of malice aforethought, and is not erroneous. Appellant's principal objection is to the latter part of the instruction, which reads: " * * * To constitute malice aforethought it is not always necessary that there exist in the mind of the slayer an intention or design to take human life; for, when an involuntary, that is to say, an unintentional killing happens in the commission of an unlawful act, which in its consequences naturally tends to destroy the life of a human being, the evil or unlawful purpose, motive or design, with which such unlawful act is done, constitutes malice aforethought, and makes even such involuntary killing murder."

This is a correct statement of the law in this regard. Appellant contends that it is inapplicable, in that the evidence does not show nor intend to show a killing under such circumstances. Even so, the instruction could not have been prejudicial as appellant claims.

■ Error is assigned to the giving of instruction No. 17. It is contended that by this instruction the court erroneously told the jury that the words "deliberation" and "premeditation" are synonymous or equivalent terms. The instruction is correct. State v. Lopez, 15 Nev. 407.

■ Instruction No. 20 reads: "In this case in order to constitute murder of the first degree the killing must have been with malice aforethought and willful, deliberate and premeditated. In such a murder an intention to kill must exist. The intention may be ascertained or deduced from the facts and circumstances of the killing such as the use of a weapon calculated to produce death, the manner of its use, and the attendant circumstances characterizing the act."

This instruction is assailed as invading the province of the jury by telling them in effect that the intent to kill is presumed from the act of killing and the use of a deadly weapon. It is obvious that such is not the effect of the instruction, and it is not erroneous. Certainly the jury could ascertain an intent to kill from the circumstances stated.

■ Appellant complains of instruction No. 21 which reads: "A person of sound mind and discretion may be presumed to intend all the natural, probable and usual consequences of his act; and when one person assaults another violently, with a deadly weapon, in a manner reasonably calculated to produce death, and the life of the party assaulted is actually destroyed in consequence of such assault, the jury are entitled to presume that death was intended, unless from a consideration of all the evidence, the jury entertain a reasonable doubt whether such intention did exist."

The instruction is correct. An instruction embodying

the same principle was approved in State v. Muldoon, 51 Nev. 322, 274 P. 922. The instruction is essentially different from the instruction condemned in State v. Pappas, 39 Nev. 40, 152 P. 571, and in State v. MacKinnon, 41 Nev. 182, 168 P. 330, as was pointed out in State v. Muldoon, supra.

■ Error is assigned to the instruction No. 30. The instruction is correct. It is an exact copy of section 9956 N. C. L.

■ Error is assigned as to instruction No. 34, which reads: "It is not necessary that the defendant's guilt should be established beyond any doubt or to an absolute certainty, but instead thereof that the defendant's guilt must be established beyond a reasonable doubt as hereinafter defined."

It is contended that this was misleading and in violation of the statute which prescribes that no definition of reasonable doubt shall be given by the court to juries in criminal actions in this state other than the statutory definition. Comp. Laws 1929, secs. 10963, 10964. We do not perceive any violation of the statute by this instruction. It essayed no other definition of reasonable doubt, but merely stated what in part appears from such definition as the same was afterwards given by the court in the terms of the statute. No prejudice could have accrued from the instruction.

■ Appellant complains of the thirty-ninth instruction, which reads: "The court has already instructed you that you are made the sole judges of the testimony, and the weight to be given the same. In determining questions of fact presented in this case you should be governed solely by the evidence introduced and admitted before you. You are to bring to the consideration of the evidence before you your everyday common sense and judgment as reasonable men; and those just and reasonable inferences and deductions which you as men would ordinarily draw from facts and circumstances proven in the case, you should act on as jurors. You are not to fancy situations or circumstances which you could not

draw from the evidence, but you are to make those just and reasonable inferences from the circumstances proven which the guarded judgment of reasonable men would ordinarily make under like circumstances."

We see no fault in the instruction.

■■■■■ Error is assigned as to the instruction numbered 40B. It reads: "The court instructs the jury that to justify homicide on the ground of self-defense, it must appear that the slayer was reasonably without fault in bringing on the difficulty, and that he believed as a reasonable man at the time that he was in such immediate danger of losing his life, or receiving serious bodily harm as rendered it necessary to take the life of his assailant to save himself therefrom; and it must appear therefrom that the defendant, acting as a reasonable man, upon the appearance of the existing conditions at the time of the encounter, believed at that time that it was necessary for him to commit the act to protect himself, and the inquiry for the jury is not whether the harm apprehended was actually intended by the assailant, but was it actual and real to the defendant as a reasonable man as compared with danger remote or contingent, and bare fear that a person is in danger of his life or receiving great bodily harm will not justify him in taking life, but it must appear that the circumstances were such as to excite the fears of a reasonable person, and that the party killing really acted under the influence of his fears and not in a spirit of revenge."

The part of the instruction complained of as faulty and prejudicial is where the instruction reads, "that to justify homicide on the ground of self-defense it must appear that the slayer was reasonably without fault in bringing on the difficulty." It is argued that the words "without fault" include any trivial fault, and that the jury might well have believed from the instruction that, when appellant told O'Brien to drive on, that there were some things he wanted to talk to him about, that was such a fault as deprived him of the right of self-defense. We think the words "reasonably without fault" were

sufficient to preclude such understanding. It is true that a person must be without fault in bringing on an encounter before he can justify a killing on the ground of self-defense, or else must have endeavored in good faith to decline any further struggle before the mortal blow was given. State v. Robison, 54 Nev. 56, 6 P.(2d) 433. The latter proposition has no basis in the evidence in this case. If the appellant desired the court to instruct more explicitly as to the nature or extent of the fault committed by a defendant in bringing on an encounter which would make the defense of self-defense unavailable, he should have prepared and requested such an instruction. State v. Smith, 10 Nev. 106–122; State v. Acosta, 49 Nev. 184, 242 P. 316. This was not done. Moreover, the court gave another instruction on self-defense predicated upon the evidence introduced by appellant to show self-defense, which correctly stated the law applicable upon this theory. On the whole the jury were fairly instructed as to this defense.

██ By instruction No. 41 the court charged the jury as follows: "Although the verdict to which each juror agrees must, of course, be his own conclusion, and not a mere acquiescence in the conclusion of his fellows, yet, in order to bring twelve minds to a unanimous result the jurors should examine with candor the questions submitted to them, with due regard and deference to the opinions of each other. If much the larger are for conviction, a dissenting juror should consider whether the doubt in his mind is a reasonable one, when it makes no impression on the minds of so many men equally honest, equally intelligent with him, who have heard the same evidence, with an equal desire to arrive at the truth, under the sanction of the same oath. On the other hand, if the minority should seriously ask themselves whether they may not reasonably, and ought not, doubt the conclusion of the judgment which is not concurred in by the most of those with whom they are associated, and, therefore, distrust the weight of sufficiency of that evidence which fails to carry conviction to the minds of

their fellows. You are not to give up a conscientious conclusion after you have reached such a conclusion finally, but it is your duty to confer with your fellow jurors carefully and earnestly, and with a desire to do absolute justice both to the state and to the defendant."

Appellant's complaint of this instruction is, in substance, that it tells a minority of the jury to distrust the testimony upon which they based their conclusions because of the fact that the greater number of their fellows was not impressed by the same evidence, and is thereby in effect a comment by the court upon the weight and sufficiency of the evidence. We perceive no ground for such criticism. It was within the discretion of the court to give such an instruction to all the jurors in the discharge of their duties if it thought proper to do so. The instruction does not tell the jurors to distrust the weight of sufficiency of any evidence unconditionally, but only that they may do so after careful consideration induced by the fact that such evidence fails to carry conviction to the minds of the majority of the jury. They are not asked to yield a conscientious conclusion finally reached, to the views of the majority, but are in fact admonished not to do so. As stated in State v. Hennessy, 29 Nev. 321, 90 P. 221, 226, 13 Ann. Cas. 1122, it is not the duty of a jury "to hold strenuously to impressions or convictions which might be in fact based upon an erroneous view or a misconception of the law or the evidence in the case, and which the juror might, upon discussion with his fellows, readily see were untenable. It is the duty of each juror to consult with his fellows and to consider their views, to the end that each may aid in arriving at the truth. Ultimately, of course, each juror should act upon his own convictions, but this is what his oath enjoins on him to do." The instruction enjoins nothing more than what was held proper in that case.

As no error appears in the record, the judgment and order appealed from are affirmed, and the district court is directed to make the proper order for the carrying

into effect by the warden of the state prison the judgment rendered.

ON PETITION FOR REHEARING

October 19, 1932.

*Per Curiam:*

Rehearing denied.