JOSEPH DONALD RICCI, APPELLANT, v. THE STATE OF NEVADA, RESPONDENT.

No. 7386

June 4, 1975 536 P.2d 79

*Sanford, Sanford, Fahrenkopf & Mousel,* Reno, for Appellant.

*Robert List,* Attorney General, Carson City; *Robert E. Rose,* District Attorney, and *Kathleen M. Wall,* Assistant Chief Deputy District Attorney, Washoe County, for Respondent.

## OPINION

By the Court, MOWBRAY, J.:

A jury in Washoe County found Joseph Donald Ricci, the appellant, guilty of second-degree murder. The district judge, after denying Ricci's motion for a new trial, sentenced him to serve 15 years in the State Prison. Ricci has appealed from

his judgment of conviction and the order denying his motion for a new trial.

1. Kenneth A. Muller, the victim of the murder, and his companion, Virginia Conlan, were, on the evening of August 18, 1970, hitchhiking on Interstate 80 east of Sparks, Nevada. Ricci, who was driving a 1969 Dodge automobile, stopped to give Kenneth and Virginia a ride. He was returning with his friend, Gary Ellington, to Yerington, Nevada. Some time after Ricci had picked up Kenneth and Virginia, he drove his car to the side of the road, stating that it was overheating. Ricci exited the car and raised its hood. He then asked Ellington to start the car, which Ellington did.

The testimony of Virginia, who was the State's principal witness, and that of Ricci differ substantially. Virginia testified that Ellington then shut the engine off and at Ricci's direction went to the front of the car. Both she and Kenneth remained seated in the car.

At this juncture, Ricci asked Kenneth if he knew anything about cars, Kenneth said he did not, but that he would see what he could do; and he went to the front of the car. Virginia testified that at this point she heard a yell that sounded like Kenneth's voice. As she jumped from the car, she saw Ricci and Kenneth struggling. The struggle carried the two men from the front of the vehicle along the passenger side to the rear of the automobile. Virginia testified that she heard a shot, and she saw Kenneth fall forward on his left side. Ricci, according to Virginia's testimony, turned toward her, and she, for the first time, saw a gun in Ricci's hand. Ricci ran for the car, while Virginia ran to Kenneth's aid. When she reached Kenneth, she glanced back and saw someone riding in the front seat passenger side of the car as it sped away with its lights off.[1]

Ricci testified that he went to the front of the car and raised the hood; that he asked Ellington to start the car. Then he noticed the oil cap was off, and he told Ellington to turn off the ignition. He asked if anyone knew anything about cars, at which point both Ellington and Kenneth exited the car.

Ricci stated that when he told Kenneth he had lost oil, Kenneth angrily declared, "What the hell can we do?" Ricci then said he wanted the couple to leave the car. He shut the hood and walked to the passenger door in order to ask Virginia to leave. As he bent down to move the seat back forward, he

---

[1]Ellington was also charged with murder; he was killed in an accident prior to trial.

heard someone running toward him. When he stood up and turned around, Kenneth, according to Ricci, slugged him on his left temple. The force of the blow knocked him backward and into the front seat of the car on the passenger side. As Kenneth started to approach him, Ricci reached into the glove compartment, grabbed his gun, cocked it, and while aiming it at Kenneth, said, "Back off." Kenneth, according to Ricci, then made a grab for the gun, but missed and grabbed Ricci's shirt instead, causing the firearm to discharge and the bullet to pass through Ricci's shirt before hitting Kenneth. Ricci claimed that Kenneth bent forward as if to grab his left thigh, and then he fell backward to the ground. When Kenneth said, "Help me," Ricci said he started to go to him, but Ellington yelled, "Let's get out of here." Believing that Kenneth was only wounded, the two men sped away.

2. Ricci's 1969 Dodge was admitted in evidence, over objection, as Exhibit DD for the limited purpose of permitting the jury to view the vehicle, first with the doors closed and then with the doors open, so that the jurors could observe the front seat area, the glove compartment (open and closed), and the dashboard, including the fuel, temperature, oil pressure, and alternator gauges. The jury viewed the vehicle in the basement of the county jail and in the presence of the defendant, his counsel, and all officers of the court. The judge explained to the jurors the limited purpose of the view.[2] Ricci claims that the judge committed reversible error in admitting the vehicle into evidence, on the principal ground that the State had failed to establish an adequate chain of custody during the approximate 2½-year period from the date of the killing to trial. Captain Kellerer of the Washoe County Sheriff's office testified that he had taken photographs of the vehicle immediately after the shooting, which photos were received in evidence without objection, and that, except for the "wear and tear and fading of paint," the physical layout

---

[2]"THE COURT: . . .

"Ladies and gentlemen, we are going to go to the basement of the jail, which is the building next door, I think, as you know, and you are going to be allowed to view this automobile and for the purposes that I have mentioned. An overall view of the car, the doors open and closed. As far as that goes, the interior, particularly of the front seat which would cover the front seat of [sic] the glove compartment, the gauges on the dashboard. None of this is available for your experimentation and so forth. Someone will open the door. Each of you will get to look in and so forth. . . ."

of the car, i.e., the doors, front seat area, dashboard, and glove compartment area, all appeared to be the same as when the shooting occurred.

This court said in Sorce v. State, 88 Nev. 350, 352–353, 497 P.2d 902, 903 (1972):

". . . It is not necessary to negate all possibilities of substitution or tampering with an exhibit, nor to trace its custody by placing each custodian upon the stand; it is sufficient to establish only that it is reasonably certain that no tampering or substitution took place, and the doubt, if any, goes to the weight of the evidence. Oliver v. State, 85 Nev. 10, 449 P.2d 252 (1969); Carter v. State, 84 Nev. 592, 446 P.2d 165 (1968); Eisentrager v. State, 79 Nev. 38, 378 P.2d 526 (1963). . . ."

While the facts in Sorce are much more restrictive than those in the instant case, the same principle applies. There was no question that Exhibit DD was the 1969 Dodge Ricci was driving on the night he shot Kenneth. The car was admitted for the sole purpose of affording the jurors an opportunity to view it. The judge so instructed them prior to the view. We reject as meritless Ricci's contention that the court committed reversible error in admitting the vehicle in evidence for the limited purpose of permitting the jury to view it.

3. Ricci asserts that the judge committed error when he failed *sua sponte* to give the jurors a cautionary instruction when he charged them regarding the possibility of there being structural changes in the car since the date of the crime. Counsel for Ricci urges that the judge promised during the trial to give such an instruction. Prior to the jury's viewing the car the following colloquy took place between Ricci's counsel and the court:

"MR. FAHRENKOPF: It is my understanding the Court will give a cautionary instruction to the jury. There has been an elapsed period of time.

"THE COURT: I will do whatever is necessary in that way, and I will explain to them what we are going to do. We will bring them in now. Do you want to do this right now? We can bring the jury in. I can explain that to them. We can go on down to the basement and you can send Mr. Malloy and have him get things set up and we will go down and stand up down there."

The court did just that, as evidenced in footnote 2, *supra*. At no time thereafter did Ricci's counsel request an additional

formal instruction. Failing to do so, Ricci may not now complain. State v. Lewis, 59 Nev. 262, 271, 91 P.2d 820, 823 (1939); State v. Hall, 54 Nev. 213, 235, 13 P.2d 624, 630 (1932).

4. During their deliberations, the jury stated to Bailiff Archuleta that they wished to view the car once again. The bailiff, after securing approval of the judge, escorted the jurors to the basement of the jail, where a second view took place. When this occurred, in addition to the two bailiffs in charge of the jury there were present the court reporter and another deputy sheriff named Oxborn. There is no suggestion of impropriety or any communication between the unauthorized persons and the jury[3]—merely the presence of the mentioned persons. Consequently, prejudice is not shown.

The appellant relies mainly upon the Ninth Circuit decision of United States v. Pittman, 449 F.2d 1284 (1971). There, the court reversed a conviction "because the privacy of the jury room was improperly invaded by an agent of the prosecution." The court noted that access to the jury during its deliberative process by any *adversary* simply cannot be tolerated.

The *adversary* to which the court referred was a government agent who had played a tape recording during trial. He also had testified at length as a witness for the government about surveillance and the chain of custody of the physical evidence, and had sat at the prosecutor's table throughout the trial. Later, during jury deliberation, that agent was asked to play the tape recording again.

Although prejudice was not shown, the fact that he had been a witness at trial for the government, and was later with

---

[3]"By Mr. FAHRENKOPF [appellant's counsel]:

"Q Mr. Archuleta, what did you understand these restrictions [regarding the view] to be?

"A Well, I don't remember exactly what they were. At the time I was there, both times, of course, they weren't allowed to get in and start the car, drive around. I don't know. They couldn't go into the trunk. I know they could look to see what gauges there were. I think somebody did look to see what gauges there were in the car on the second visit as they did on the first visit. I don't recall anything being done the second time that wasn't done the first time.

"Q What you are saying is that this time, not remembering all of the admonitions of the Court, it is your opinion that they didn't do anything that they didn't do the first time?

"A That is correct."

the jury during its deliberation, convinced the court that due process was denied the accused.

To the same general effect is Turner v. Louisiana, 379 U.S. 466 (1965), where the Supreme Court found a denial of due process when the two principal witnesses for the prosecution were also in charge of the jury.

The case before us is not quite the same. None of those who accompanied the jury was a witness for the prosecution, and none was, within the meaning of Pittman or Turner, an *adversary* who had invaded the jury during its deliberation. Assuming it was wrong for them to have been there, on the record it was harmless.

5. During the trial a color photograph of Kenneth standing next to his mother was received in evidence. Kenneth's mother was asked if the photo fairly and accurately depicted the height and weight of her son at the time he was shot. She answered in the affirmative. There was no objection to the form of the question at trial, but on appeal Ricci urges that the proper phrasing of the inquiry should have been whether the photograph was a fair and accurate representation of what it purported to show. Since the photo was offered to show Kenneth's height and weight and there was no objection to the question when asked, we find that the foundation for its introduction was sufficient. Ricci also complains that Kenneth's height and weight were irrelevant and that the photo, being in color, was highly prejudicial. Although there was a black-and-white photo of Kenneth's face in evidence, the color photo of Kenneth and his mother had probative value in showing Kenneth's height and weight. These facts related to Kenneth's ability to reach over the open passenger door and deliver a heavy blow to Ricci's forehead, as Ricci claimed. The exhibit was relevant. NRS 48.015.[4] Although it was in color, it was clearly not prejudicial, and it was offered to prove facts which the black-and-white photo of Kenneth could not do. See Shuff v. State, 86 Nev. 736, 476 P.2d 22 (1970).

6. Ricci objects to the following instructions given by the judge to the jury:

---

[4]NRS 48.015:

"As used in this chapter, 'relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence."

A. Ricci complains that Instruction No. 17[5] is in effect a comment on the evidence in violation of article 6, section 12, of the Nevada Constitution, and further that the instruction directs the jury to find an intent in violation of NRS 47.230.[6] The judge did not instruct the jury to find an intent to kill, nor did the instruction indicate that certain facts were established. See State v. Hall, *supra,* 54 Nev. at 240, 13 P.2d at 632. The court, by giving the instruction, permitted the jury to infer intent on Ricci's part if the jury found the existence of certain facts: use of "a deadly weapon . . . at a vital part," which "inflicts a mortal wound. . . ." See Walker v. State, 78 Nev. 463, 376 P.2d 137 (1962). The objection to the instruction is without merit.

B. Ricci objects to Instruction No. 18 on the ground that the words "evil or wrongful purpose, motive or design" were

---

[5]Instruction No. 17:

"If a person, without legal justification or excuse, intentionally uses a deadly weapon upon the person of another at a vital part, and inflicts a mortal wound, under circumstances showing no considerable provocation, then intent to kill may be presumed or implied as an inference of fact from the act itself."

[6]NRS 47.230:

"1. In criminal actions, presumptions against an accused recognized at common law or created by statute, including statutory provisions that certain facts are prima facie evidence of other facts or of guilt, are governed by this section.

"2. The judge shall not direct the jury to find a presumed fact against the accused. When the presumed fact established guilt or is an element of the offense or negatives a defense, the judge may submit the question of guilt or of the existence of the presumed fact to the jury, if, but only if, a reasonable juror on the evidence as a whole, including the evidence of the basic facts, could find guilt or the presumed fact beyond a reasonable doubt. Under other presumptions, the existence of the presumed fact may be submitted to the jury if the basic facts are supported by substantial evidence, or are otherwise established, unless the evidence as a whole negatives the existence of the presumed fact.

"3. Whenever the existence of a presumed fact against the accused is submitted to the jury, the judge shall give an instruction that the law declares that the jury may regard the basic facts as sufficient evidence of the presumed fact but does not require it to do so. In addition, if the presumed fact establishes guilt or is an element of the offense or negatives a defense, the judge shall instruct the jury that its existence must, on all the evidence, be proved beyond a reasonable doubt."

omitted from the instruction.[7] However, the words "unlawful act" were substituted therefor, and if any prejudice resulted, it was in Ricci's favor. State v. Hall, *supra*, 54 Nev. at 239, 13 P.2d at 632.

C. Ricci urges that Instruction No. 23[8] was fatally defective because it should have included the provisions of NRS 200.120.[9] In light of the evidence adduced, we think Instruction No. 23 adequately covered this aspect of appellant's theory of defense.

---

[7]Instruction No. 18:

"If the unlawful killing of a human being is done with malice aforethought, but without deliberation and premeditation, that is, without the wilful, deliberate and premeditated intent to take life which is an essential element of first degree murder, or is not perpetrated by means of poison, or lying in wait, or torture, and is not committed in the perpetration or intent to perpetrate arson, rape, robbery, or burglary, then the offense is murder in the second degree.

"In practical application this means that the unlawful killing of a human being with malice aforethought, but without a deliberately formed and premeditated intent to kill, is murder of the second degree when the killing results from an unlawful act, the natural consequences of which are dangerous to life, which act is intentionally performed by a person who knows that his conduct endangers the life of another, even though the person has not specifically formed an intention to kill."

[8]Instruction No. 23:

"Justifiable homicide is the killing of a human being in necessary self-defense.

"If a person kill another in self-defense, it must appear that:

"1. The danger was so urgent and pressing that, in order to save his own life, or to prevent his receiving great bodily harm, the killing of the other was absolutely necessary; and

"2. The person killed was the assailant, or that the slayer had really and in good faith endeavored to decline any further struggle before the mortal blow was given.

"A bare fear of any such offense, to prevent which the homicide is alleged to have been committed, shall not be sufficient to justify the killing. It must appear that the circumstances were sufficient to excite the fears of a reasonable person and that the party killing really acted under the influence of those fears, and not in a spirit of revenge."

[9]NRS 200.120:

"Justifiable homicide is the killing of a human being in necessary self-defense, or in defense of habitation, property or person, against one who manifestly intends, or endeavors, by violence or surprise, to commit a felony, or against any person or persons who manifestly intend and endeavor, in a violent, riotous or tumultuous manner, to enter the habitation of another for the purpose of assaulting or offering personal violence to any person dwelling or being therein."

D. Finally, Ricci's objection to Instruction No. 31[10] is without merit. It sets forth the criteria of the heat of passion which will reduce a homicide to manslaughter, and it was a proper instruction.

7. Ricci offered numerous instructions which were rejected by the judge. Of the instructions offered and refused, only Instruction No. III requires discussion. The other offered instructions (I, II, VI, VII, VIII, and IX) were already covered in the instructions given to the jury, or they (IV, V, X, XI, XII) were incomplete or erroneous statements of the law.

Requested Instruction No. III stated: "When a person commits an act or makes an omission through misfortune or by accident under circumstances that show no evil design, intention or culpable negligence, he does not thereby commit a crime."

Ricci contends that his testimony that the gun "just went off" and that he did not remember pulling the trigger supports his theory that the shooting was an accident and therefore requires an instruction to that effect. Barger v. State, 81 Nev. 548, 407 P.2d 584 (1965). The source of the instruction is NRS 194.010(7)[11] and CALJIC 4.45. As noted in CALJIC

---

[10]Instruction No. 31:

"The heat of passion which will reduce a homicide to manslaughter must be such a passion as naturally would be aroused in the mind of an ordinarily reasonable person in the same circumstances. A defendant is not permitted to set up his own standard of conduct and to justify or excuse himself because his passions were aroused unless the circumstances in which he was placed and the facts that confronted him were such as also would have aroused the passion of the ordinarily reasonable man, if likewise situated. The basic inquiry is whether or not, at the time of the killing, the reason of the accused was obscured or disturbed by passion to such an extent as would cause the ordinarily reasonable person of average disposition to act rashly and without deliberation and reflection, and from such passion rather than from judgment."

[11]NRS 194.010(7):

"All persons are liable to punishment except those belonging to the following classes:

". . .

"7. Persons who committed the act or made the omission charged, through misfortune or by accident, when it appears that there was no evil design, intention or culpable negligence."

4.45, the instruction is improper, where the offense charged is a homicide. Ricci was offered an opportunity to submit an appropriate instruction and rejected it. He may not now complain. State v. Hall, *supra,* 54 Nev. at 243, 13 P.2d at 633.

8. Other assigned errors have been considered and are without merit.

The order denying the motion for a new trial and the judgment of conviction are affirmed.

GUNDERSON, C. J., and BATJER, ZENOFF, and THOMPSON, JJ., concur.